

**FILED**

May 31 2016, 8:36 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel C. Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Mark D. Nichols,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | May 31, 2016<br><br>Court of Appeals Case No.<br>67A01-1510-CR-1609<br><br>Appeal from the Putnam Superior Court<br><br>The Honorable Charles D. Bridges, Judge<br><br>Trial Court Cause No.<br>67D01-1207-FB-102 |

**Brown, Judge.**

[1] Mark D. Nichols appeals his convictions for three counts of sexual misconduct with a minor as class B felonies and two counts of sexual misconduct with a minor as class C felonies. Nichols raises two issues which we revise and restate as:

> I. Whether the trial court abused its discretion in admitting evidence that Nichols did not attend an interview with a detective or ask about the investigation; and
>
> II. Whether the admission of testimony by a polygraph examiner and counselor resulted in fundamental error.

We affirm.

### Facts and Procedural History

[2] M.S., born in 1997, was placed in ResCare between November 2011 and May 2012 under probationary charges "to receive treatment for perpetrating and being the victim of sexual abuse." Transcript at 8. M.S. resided in the Miller Jones home which housed ten girls. During the day, two staff members were with the girls, and one staff member was present at night. Nichols was a staff member at the ResCare facility, which contained multiple campuses, and was present "on and off, just dropping by occasionally at the girl's [sic] house." *Id.* at 11.

[3] In January 2012, Neil Remaklus administered a polygraph exam to M.S. which was "in line with [her] treatment to make sure [she] was telling the whole truth" concerning the sexual abuse. *Id.* at 9.

[4] On the evening of March 30, 2012, Nichols was the supervising adult in the Miller Jones home. Nichols, S.W., who was born in 1997, and another girl, C., sat on one couch, and M.S. sat on another couch. C. became tired and went upstairs to bed. S.W. covered herself with a blanket, and Nichols also covered himself with the blanket. S.W. asked Nichols what he was doing, and Nichols said that he was cold. M.S. fell asleep.

[5] Nichols began poking S.W.'s thighs with his finger. S.W. asked Nichols what he was doing, and Nichols said: "[W]ell if you don't want it, I won't do it." *Id.* at 49. S.W. "didn't want to make him as bad, so . . . was like, oh, it's fine, it's fine." *Id.* Nichols told S.W. that his ex-girlfriends had something in common and that they were all younger than him. Nichols and S.W. started kissing, Nichols tried to get under her pants, S.W. said that M.S. was right there, and Nichols said that it was fine and M.S. would not wake up. S.W. went over to M.S., woke her, and told her to go upstairs. S.W. seemed "kinda scared" to M.S., but M.S. went to bed because she was tired. *Id.* at 29.

[6] Nichols then had S.W. give him oral sex, and they engaged in sexual intercourse, but Nichols did not climax. S.W. moved to the Laviolette House the next Wednesday.

[7] On the evening of April 6, 2012, after a different supervising adult was relieved by Nichols, M.S. went to "hang out" with Nichols. *Id.* at 15. Nichols and M.S. "hung out for a while" downstairs on the couch. *Id.* at 14. Nichols then began massaging M.S.'s feet and teased her about her telling on him because

she "had told on an experience [she had] with another girl in the facility and had gotten in trouble over it" and that she "was going to tell in the morning that [her] feet had felt so good, because he was massaging them . . . ." *Id.* at 15. During this time, the other girls were upstairs asleep. Nichols kept taking one of M.S.'s feet and putting it onto his groin area, and M.S. kept moving her foot away. Nichols kept doing so, looked at M.S., and said, "so what do you want to do next?" *Id.* at 16. M.S. felt scared, did not respond, and "couldn't really tell him no, because he was the person in charge of [her] at that time." *Id.*

[8] Nichols then "set [M.S.] across his lap, sort of like you would sit across a saddle or something," "started pulling [her] breast out of [her] nightshirt," and began biting her nipples. *Id.* It was painful, M.S. pulled away, but Nichols "kept on." *Id.* at 17. He then started pulling off M.S.'s shirt, fondled her all over, and inserted his finger into her vagina. M.S. told Nichols that she "couldn't" and that she was on her period. *Id.* Nichols said that he did not have any protection, continued to fondle her, and said: "[O]h well, you'll just tell in the morning and make it a big deal . . . ." *Id.* Nichols then made M.S. put her hands on his penis and "fondle him and pleasure him." *Id.* Nichols "took one leg off of [her] pants," engaged in sexual intercourse with M.S., and pulled out before he ejaculated. *Id.* at 18. Nichols then made M.S. give him oral sex. He ejaculated on the couch or "on himself really." *Id.* He then went to the staff restroom, cleaned himself, and he and M.S. used disinfectant wipes on the couch and couch pillows.

[9] At some point later, M.S. told S.W. that Nichols had put her foot on his private parts repeatedly, and S.W. said: "[N]o, he didn't do that . . . he loves me, we did it, we had sex." *Id.* at 22.

[10] On May 30, 2012, M.S. planned to take her second polygraph at ResCare with Neil Remaklus at the end of her stay "to make sure that [she] was still maintaining a truthful status." *Id.* at 20. In the questionnaire prior to the polygraph, M.S. disclosed what had happened with Nichols. She stated to Remaklus that she had sexual intercourse with Nichols because she did not want to fail the polygraph and be sent back to ResCare. Remaklus then pulled Allison Dobbs, a counselor at ResCare, into the room. M.S. told them that S.W. had said that she had sex with Nichols. M.S. continued her treatment through a different facility.

[11] On July 5, 2012, the State charged Nichols with Count I, sexual misconduct with a minor as a class B felony; Count II, sexual misconduct with a minor as a class B felony; Count III, sexual misconduct with a minor as a class C felony; Count IV, sexual misconduct with a minor as a class B felony; and Count V, sexual misconduct with a minor as a class C felony.[1] On May 20, 2015, Nichols waived trial by jury.

---

[1] Counts I, II, and III related to Nichols's actions with M.S., and Counts IV and V related to his actions with S.W.

[12] On August 14, 2015, the court held a bench trial, M.S. and S.W. testified to the foregoing, and Remaklus then testified. During direct examination, Remaklus stated that he told M.S. the importance of passing the polygraph examination and that if she failed, then the counselor would not know the truth, and he stressed to her how important it was to tell the truth. The prosecutor asked what M.S. had disclosed to him, and he responded that she "stated that initially she wasn't going to come in and tell this information, but she felt that she had to. At that point she also stated that that she had had . . . ." *Id.* at 71. Defense counsel then immediately stated:

> Judge, . . . I thought . . . we we're going to, I mean, we had a kind of an informal stipulation, but I didn't know he was going to verbatim, just recite what he remembered as, I mean . . . I thought that he was going to testify to what she said basically happened, not to this level of detail. I mean, the way he's starting out, it's like there's, he's just starting a long story and I, you know, it's supposed to be narrow in scope and just basically what she'd said, you know.

*Id.* The following exchange then occurred:

> [Prosecutor]: Well, he hasn't said anything yet, that's what we're getting to. I'm just asking basically, you know, in a fairly short thing to say what she told him.
>
> THE COURT: He just got to, what did she tell you?
>
> [Defense Counsel]: Alright. Thank you, Your Honor.

*Id.* Remaklus then testified that M.S. stated that she had sexual contact with Nichols and that she thought S.W. also had sexual contact with Nichols.

[13] Dobbs, the counselor at ResCare, then testified, without objection, that she was called in because she was told that M.S. had disclosed that she had sex with Nichols and that she was needed to process the information with M.S. at that time. She also testified that M.S. informed her that S.W. had also been involved in a relationship, with Nichols, that she met with S.W. separately, and that S.W. was very emotional and informed her that it was true.

[14] During direct examination, Greencastle City Police Detective Captain Randolph Seipel testified that he investigated the case, found Nichols at a residence, told him that he had been looking for him regarding a case he was investigating at ResCare, and asked him if he could come to the police department the following day to speak with him. Nichols's counsel objected on the grounds of privilege against self-incrimination and relevancy. Specifically, he argued that "the Fifth Amendment privilege against self-incrimination . . . would dictate to us that any implication or any (INDISCERNIBLE) of any wrongfulness arising out of failing to fully cooperate or anything like that, should not be considered as evidence." *Id.* at 85. After Detective Seipel testified that he did not tell Nichols that he was going to take him into custody, and after some discussion the court stated: "Well, I think if he was in custody that would be one thing, but I think just asking him to come to the station to give a statement and talk to him." *Id.* Nichols's counsel then stated: "I think that's fine, but I just don't think he can sit here and testify about my client's not

following through. I believe that shouldn't be considered as relevant, because, maybe my client decided to invoke . . . ." *Id.* at 85-86. The court then said: "Well, he didn't testify to that, you just did, but I'll give it the weight that it deserves." *Id.* at 86. Detective Seipel then testified that Nichols agreed to meet him, but did not inquire at all as to why he wanted to speak with him, and that Nichols did not meet him the next day.

[15] Nichols testified that he did not remember the exact dates, but that he worked two consecutive Friday or Saturday nights, and that on March 30, 2012, after the other adult supervisor left, M.S., S.W. and two other girls went downstairs and just wanted to talk, and he had no problem with that. He testified that two girls went to bed, M.S. and S.W. remained downstairs, M.S. eventually said that she was tired and was going to bed, S.W. said "let's hang out," M.S. again said she was going to bed, and he said "it's time, we need to go to bed, you need to go upstairs," and "that was the end of it." *Id.* at 96. He testified that on the next Friday when he arrived, everyone was in bed and stayed in bed except for bathroom breaks, and he did not do anything that night. He further testified that he did not have sex with S.W, and denied having a one-on-one conversation with M.S. alone or having any kind of inappropriate sexual contact with her. He stated that it was not true that he never asked Detective Seipel why he came to his door. He also testified that he told Detective Seipel that he would come to the office tomorrow but "later decided there was no needing for me to go there about ResCare." *Id.* at 105. The prosecutor asked Nichols if he asked Detective Seipel about ResCare, and Nichols's counsel

objected on the basis of relevance and stated that "you don't make an inference of guilt based on non-cooperation and yet he's beating the drum over here about this." *Id.* at 106. The court sustained the objection.

[16] After closing arguments, the court stated: "I can't say that I've seen two (2) girls that are more credible in their testimony in almost forty (40) years. They have absolutely no reason to lie. Their stories . . . almost mirror one another and they haven't seen each other since 2012." *Id.* at 121. The court found Nichols guilty as charged and sentenced him to fifteen years for each of the class B felonies and four years for each class C felony. The court ordered that the counts related to M.S. be served concurrent with each other and consecutive to the counts related to S.W. for an aggregate sentence of thirty years, with twenty-five years executed in the Department of Correction and five years suspended to probation.

## *Discussion*

### I.

[17] The first issue is whether the trial court abused its discretion in admitting evidence that Nichols did not attend an interview with Detective Seipel or ask about the investigation. Generally, we review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. We may affirm a

trial court's decision regarding the admission of evidence if it is sustainable on any basis in the record. *Barker v. State*, 695 N.E.2d 925, 930 (Ind. 1998), *reh'g denied*. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*. We have stated previously that "[a]ny error caused by the admission of evidence is harmless error . . . if the erroneously admitted evidence was cumulative of other evidence appropriately admitted." *Iqbal v. State*, 805 N.E.2d 401, 406 (Ind. Ct. App. 2004).

[18] Nichols argues that there can be no other reason to offer evidence that he did not meet with Detective Seipel or ask what the investigation was about other than to create an inference of consciousness of guilt on his part. He asserts that the trial court violated his privilege against self-incrimination by admitting this evidence. He also argues that the State used this inadmissible evidence to impeach his innocence even before he ever had a legitimate opportunity to defend himself.

[19] The State argues that evidence of Nichols's failure to appear was admissible under *Salinas v. Texas*, 133 S. Ct. 2174 (2013), and *Owens v. State*, 937 N.E.2d 880 (Ind. Ct. App. 2010), *reh'g denied*, *trans. denied*. The State's position is that, even if the trial court erred, any error is harmless given the court's statement that it would give this evidence "the weight that it deserves" and the finding of guilt that "referenced nothing but the highly credible testimony of M.S. and S.W., and [Nichols's] suspect testimony." Appellee's Brief at 23-24.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." "[A] witness who desires the protection of the privilege must claim it at the time he relies on it." *Salinas*, 133 S. Ct. at 2179 (internal quotation marks and ellipsis omitted).[2] The record does not reveal that Nichols invoked the privilege against self-incrimination. *See id.* at 2178-2180 (a plurality opinion held that a witness does not invoke the privilege against self-incrimination by simply standing mute and that the prosecution's use of the defendant's noncustodial silence did not violate the Fifth Amendment because the defendant failed to state that he was not answering the officer's question on Fifth Amendment grounds); *Mira v. State*, 3 N.E.3d 985, 986-989 (Ind. Ct. App. 2013) (noting that the defendant did not call a detective back after the detective wrote a letter indicating that the defendant was a suspect in a larceny and needed to contact the detective and that the defendant told the detective that he would call back, citing *Owens*, 937 N.E.2d 880, and holding that the failure on the defendant's part to follow up with the detective did not support a finding that he invoked his right to remain silent). We cannot say that the court abused its discretion in admitting this evidence.

---

[2] Justice Alito announced the judgment of the Court and delivered the opinion in which Chief Justice Roberts and Justice Kennedy joined. 133 S. Ct. at 2177. Justice Thomas, with whom Justice Scalia joined, concurred in the judgment and wrote in part that "[t]he plurality avoids reaching that question and instead concludes that Salinas' Fifth Amendment claim fails because he did not expressly invoke the privilege." *Id.* at 2184 (Thomas, J., concurring). Justice Thomas stated: "I think there is a simpler way to resolve this case. In my view, Salinas' claim would fail even if he had invoked the privilege because the prosecutor's comments regarding his precustodial silence did not compel him to give self-incriminating testimony." *Id.*

The next issue is whether the admission of the testimony of Remaklus and Dobbs resulted in fundamental error. Nichols argues that their testimony was hearsay and was introduced against him in a manner that impermissibly vouched for those statements. He acknowledges that his counsel did not object to the statements, but argues that the admission was fundamental error, and that "[b]ecause the indirect vouching and hearsay was used to lend credibility to victims' claims that were not corroborated by other evidence, it is impossible to parse out how much that influenced the fact-finder's impression that they were credible witnesses." Appellant's Brief at 12-13.

Specifically, he points to the following exchange that occurred during the direct examination of Remaklus:

> A: During the course of interviewing her, we started to talk. She had previously filled out the questionnaire, but then as I was speaking with her, I was telling her the importance of to pass the polygraph examination; because at that point, even though they may have to admit some things, at least the individuals that they're working with, the counselor, will know at that point, okay, this is what we're dealing with, because you passed the polygraph. Whereas if they fail, then the counselor, whoever I'm doing the work for, does not know the truth, the whole truth. So can't really believe anything they say at that point. So I was stressing to her how important it is to tell the truth, the whole truth and nothing but the truth throughout the exam.
>
> Q: Did you tell her what happens if she didn't tell the truth?

A: Exactly. I said that she had just transitioned to home and to live with her grandmother, I explained that if she were to continue, or if she were to fail this polygraph exam, that's in jeopardy, because I don't, I told her I don't make that decision, but at that point, they don't know for sure what's she's done, they don't know if she's done in while she's been home that week or while she's been there at ResCare. So I said it's very important for her to pass the polygraph exam to know exactly what's happened.

Q: So she knew lying meant that she may not get to go home?

A: Exactly.

Q: So what did she disclose to you then?

A: At that point she stated that initially she wasn't going to come in and tell this information, but she felt that she had to. At that point she also stated that that she had had . . . .

Transcript at 70-71. He also points to Dobbs's testimony that she was called in because she was told that M.S. had disclosed some information that they needed her to process with M.S., that the information was that Nichols had sex with her, that Dobbs met with S.W., and that "S.W. was very emotional and informed" her that "it was true." *Id.* at 76.

[23] The State argues that the admission of the testimony of Remaklus and Dobbs as to statements made to them by M.S. and S.W. did not constitute impermissible hearsay and that the sole reason for the admission of their testimony was to show how it came to be that M.S. and S.W. disclosed Nichols's sexual

misconduct almost two months after the fact. The State points out that the parties had entered into an informal stipulation that Remaklus and Dobbs could testify briefly as to the statements M.S. and S.W. made to them and that, by entering into this stipulation, Nichols invited any error with regard to their testimony and cannot now claim fundamental error on appeal. The State also notes that M.S. and S.W. testified to making the statements to Remaklus and Dobbs, and contends that the admission of the testimony of Remaklus and Dobbs is merely cumulative. Finally, the State argues that Remaklus's testimony did not constitute improper vouching because reminding an interviewee to tell the truth does not imply that the interviewer thinks that the response that follows is truthful, and that it had nothing to do with vouching for M.S.'s credibility.

[24] As conceded by Nichols, he did not object to the testimony of Remaklus and Dobbs. To circumvent waiver, Nichols contends that the admission of their testimony resulted in fundamental error. Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). It is error that makes "a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process . . . present[ing] an undeniable and substantial potential for harm." *Id.* "This exception is available only in 'egregious circumstances.'" *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010) (quoting *Brown v. State*, 799 N.E.2d 1064, 1068 (Ind. 2003)), *reh'g denied*. "Fundamental error is meant to permit appellate courts a means to correct the most egregious

and blatant trial errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error." *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014), *reh'g denied*.

[25] During Remaklus's testimony, Nichols's counsel stated that "we had a kind of an informal stipulation" and stated that the testimony was "supposed to be narrow in scope and just basically what she'd said . . . ." Transcript at 71. To the extent Nichols bases his argument on Remaklus's testimony regarding what M.S. told him, the record reveals that Nichols invited any error by acknowledging that the parties stipulated that he could testify as to what M.S. "basically" said. *Id.* The invited error doctrine forbids a party to take advantage of an error that he "commits, invites, or which is the natural consequence of [his] own neglect or misconduct." *Brewington v. State*, 7 N.E.3d 946, 975 (Ind. 2014) (quoting *Wright v. State*, 828 N.E.2d 904, 907 (Ind. 2005)), *reh'g denied*, *cert. denied*, 135 S. Ct. 970, *reh'g denied*. We conclude that Nichols invited any error with respect to this portion of Remaklus's testimony.

[26] To the extent Nichols asserts that Remaklus and Dobbs improperly vouched for M.S. and S.W., we note that Ind. Evidence Rule 704(b) provides that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." The Indiana Supreme Court discussed indirect vouching in *Hoglund v. State* and concluded that testimony concerning whether an alleged child victim is not prone to exaggerate or

fantasize about sexual matters is an indirect but nonetheless functional equivalent of saying the child is telling the truth. 962 N.E.2d 1230, 1236 (Ind. 2012), *reh'g denied*.

[27] Even assuming that this testimony constituted improper vouching, we cannot say that its admission resulted in fundamental error. M.S. and S.W. testified and were thoroughly cross-examined. We conclude that Remaklus's testimony regarding the importance of telling the truth was cumulative of M.S.'s testimony that she had to take a polygraph examination in accordance with her treatment program "to make sure [she] was getting everything out on the table," that if she lied they could not help her, and that if she did not tell the truth then she would have to take another one. Transcript at 10. We cannot say that the testimony of Remaklus and Dobbs was so prejudicial as to make a fair trial impossible or that Nichols has demonstrated fundamental error. *See Sampson v. State*, 38 N.E.3d 985, 992-993 (Ind. 2015) (rejecting the defendant's fundamental error argument where the credibility of the alleged victim, S.B., was at stake, she was thoroughly questioned on cross-examination and her testimony did not waver from that given during direct examination, and the forensic interviewer's response of "[n]o" to the question "[d]uring your interview with [S.B.], did you observe any signs that she had been coached" was not so prejudicial to the defendant as to make a fair trial impossible); *Hoglund*, 962 N.E.2d at 1238-1240 (holding that indirect vouching testimony, which came from three witnesses, did not rise to the level of fundamental error).

## *Conclusion*

[28]  For the foregoing reasons, we affirm Nichols's convictions.

[29]  Affirmed.


Baker, J., and May, J., concur.