FILED
Mar 13 2017, 8:47 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Ruth Johnson
Matthew D. Anglemeyer
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Argumedo Alvarez-Madrigal, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | March 13, 2017 <br><br> Court of Appeals Case No. 49A02-1601-CR-162 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Grant W. Hawkins, Judge <br><br> Trial Court Cause No. 49G05-1407-FA-33963 |

**Kirsch, Judge.**

[1] Following a jury trial, Argumedo Alvarez-Madrigal ("Alvarez-Madrigal") was convicted of four counts of Class A felony child molesting[1] and two counts of Class C felony child molesting.[2] He appeals, contending that a statement by a State's witness constituted impermissible vouching evidence and that it was reversible error to admit it.

[2] We affirm.

## Facts and Procedural History

[3] When she was ten years old and in the fourth grade, A.M. met and became close friends with fellow fourth-grader S.A.O., whose father is Alvarez-Madrigal. During the summer before the girls entered fifth grade, A.M. spent a lot of time at S.A.O.'s house. S.A.O.'s mother worked nights, and Alvarez-Madrigal watched the children while she slept during the day.

[4] The facts most favorable to the verdict are that, in May 2014, when A.M. was eleven years old, Alvarez-Madrigal began to touch A.M. inappropriately. On May 8 or 9, when A.M. was spending the night at S.A.O.'s house, S.A.O. left the room to use the restroom, and Alvarez-Madrigal put his hand under A.M.'s bra and then felt around her vagina, over her pajamas. From that date to June 6, A.M. went to S.A.O.'s house almost every day, and Alvarez-Madrigal

---

[1] *See* Ind. Code § 35-42-4-3(a)(1). We note that, effective July1, 2014, a new version of this statute was enacted. However, we will apply the statute in effect at the time he committed his crimes in June 2014.

[2] *See* Ind. Code § 35-42-4-3(b).

touched A.M. "[e]very time I would go over there." *Tr.* at 43. A.M. testified that S.A.O. and her mother "saw what was going on" on various occasions. *Id.* at 93. A.M. was worried that if she told anyone, it would ruin her friendship with S.A.O.

[5] On June 6, 2014, when A.M. entered S.A.O.'s house and began to walk up the stairs to S.A.O.'s bedroom, Alvarez-Madrigal put his hand "on [A.M.'s] butt" under her underwear. *Id.* at 47. He kept his hand there as A.M. walked up the flight of stairs. When they reached the top of the stairs, S.A.O. came out of her bedroom, "looked surprised," and started yelling at Alvarez-Madrigal. *Id.* at 48. A.M. testified that S.A.O.'s mother also came out of her bedroom and asked what was going on, but the girls went into S.A.O.'s bedroom without saying anything to S.A.O.'s mother. On June 10, while other household members were elsewhere in the house, Alvarez-Madrigal kissed A.M. on the neck and touched her under her underwear, on her vagina.

[6] On June 14, 2014, Alvarez-Madrigal drove A.M. and S.A.O. to a swimming pool and then back to S.A.O.'s house. S.A.O.'s mother was at home sleeping. A.M. went to the upstairs bathroom to change out of her swimming suit, and while she was still in the bathroom, she heard S.A.O. open the door and go outside the house. A.M. put on a swim cover, which was like a dress, over her underwear and bra. She left the bathroom and went downstairs, and Alvarez-Madrigal appeared, picked her up under the arms, put her back to the wall, and when she started to scream, he put his hand over her mouth. Despite A.M.'s protests, Alvarez-Madrigal took off her swim cover and her bra. When A.M.

would not spread her legs, he hit her in the thigh, which left a mark. Alvarez-Madrigal pulled down her underwear, threw her onto a couch, and had vaginal and anal intercourse with her. When she initially would not open her mouth to perform oral sex, he slapped her on the face, leaving a red mark,[3] and then he stuck his penis in her mouth and moved it back and forth.

[7] When S.A.O. began to enter the house, Alvarez-Madrigal collected A.M.'s clothes and threw them at her and told her to go to the bathroom. A.M. saw S.A.O. peeking around the corner. A.M. hurried to the bathroom, but heard Alvarez-Madrigal talking to S.A.O. in the kitchen and begging S.A.O., "Please don't tell your mother. I'll do anything for you." *Tr.* at 69. When A.M. left the bathroom, Alvarez-Madrigal "banged [her] against the wall" and told A.M. that he would kill her if she told anyone. *Id.* at 70. A.M. left the house and spoke to S.A.O. outside, telling her some, but not all, of the things Alvarez-Madrigal had done to her, and A.M. asked S.A.O. to tell her father to stop touching A.M. S.A.O. told A.M. that she would "have a talk with him." *Id.* at 72. A few weeks after the June 14 incident, A.M. told a friend, P.J., about what S.A.O.'s father had done to her, and P.J. told a mentor. On June 29, 2014, a report was made to Indiana Department of Child Services ("DCS").

[8] When DCS made an unannounced visit to A.M.'s home on or about June 29, A.M. told her mother what Alvarez-Madrigal had done to her. A.M. also told

---

[3] A.M.'s parents later asked her about the redness near her mouth, but A.M. told them "that [she] just hit it on something." *Tr.* at 97.

DCS assessment case manager Nola Hunt ("Hunt") and the accompanying Indianapolis Metropolitan Police Department ("IMPD") officer about Alvarez-Madrigal's conduct. Hunt paged IMPD Detective Mark Barnett ("Detective Barnett"), the "on-call" child abuse detective. Detective Barnett decided "an immediate response" was warranted "based primarily on the proximity of the alleged victim and suspect . . ., living on the same street." *Id.* at 187-88. Hunt then transported A.M. and A.M.'s parents to DCS offices, where A.M. participated in a forensic interview at the Child Advocacy Center with IMPD Detective Nicolle Flynn ("Detective Flynn"). During the interview, A.M. disclosed information of a sexual nature describing what had happened to her about two weeks prior. Hunt and Detective Barnett observed the interview from another room, and based on what he observed, Detective Barnett prepared, and later executed, a search warrant for Alvarez-Madrigal's residence. Detective Barnett interviewed Alvarez-Madrigal and his wife, and, at some point, S.A.O. and P.J. were also interviewed by DCS. A.M. was examined on July 2, 2014, and again on July 9, 2014, at the Riley Hospital Pediatric Center for Hope.

[9] On July 3, 2014, the State charged Alvarez-Madrigal with five counts of Class A felony child molesting and two counts of Class C felony child molesting. At the two-day August 2015 jury trial, the State presented the testimony of A.M., P.J., S.A.O., and S.A.O.'s mother. The State also presented the testimony of Hunt, Detective Flynn, and Detective Barnett. The last witness to testify was

Shannon Thompson, M.D. ("Dr. Thompson"), a pediatrician at Riley Children's Hospital ("Riley") on the child abuse protection team.

[10]     Dr. Thompson examined A.M. at the second examination, on July 9, 2014. Dr. Thompson stated that the reason A.M. returned to Riley was because she was having "continued genital pain and itching." *Id*. at 293. Dr. Thompson testified that although neither examination at Riley revealed physical injuries, the lack of physical findings was "very common" in sexual abuse cases. *Id*. at 296. She explained that there are various reasons for that, including that no injury occurred in the first place or that "disclosure often occurs days to months later," and the genital tissue heals quickly. *Id*. at 297. She testified that, therefore, it is "very common" for a child to have a normal exam. *Id*. at 298. The State continued direct examination of Dr. Thompson regarding the frequency with which she observes physical injuries:

> STATE:  In terms of the cases you have seen, do you know what percentage of children you see with injuries?
>
> THOMPSON:  So overall about 4 to 5 percent of children who have been victims of sexual abuse will have some kind of obvious physical evidence of penetration or sexual abuse. In my experience I've probably seen one.
>
> STATE:  One in 10 years of being a child abuse pediatrician?
>
> THOMPSON:  7 1/2 years.

STATE: My math is not great. Okay. And does that mean that all the rest of those children are making up allegations?

THOMPSON: No, it doesn't mean that. It just means it's the nature of the abuse. Like I said, often the disclosure is late, injuries are subtle or even very obvious it healed by the time we get to see them. *And in fact some statistics will quote that less than two to three children out of a thousand are making up claims.*

*Id*. at 298-99 (emphasis added).

[11] Alvarez-Madrigal then objected, stating, "This clearly calls for speculation. It's not relevant to the facts in this case." *Id*. at 299. The State responded, "She's a child abuse expert. She has talked about her evaluation of psychological and emotional mental health. It's part of her job to know statistics." *Id*. The trial court did not expressly rule on the objection, but stated, "Then ask her this, ask every question in terms of reasonable medical certainty." *Id*. The State proceeded to ask Dr. Thompson, "[W]ith regard to this case to a degree of reasonable medical certainty, what's your opinion as to A.M.'s exam?" *Id*. Dr. Thompson responded that A.M. did not have any overt symptoms or physical findings that would be consistent with sexual abuse, but that lack of physical findings would not be determinative, and that the history that A.M. provided was consistent with sexual abuse. *Id*. at 299-300.

[12] Upon cross examination, Dr. Thompson acknowledged that, although there was no physical injury or infection observed, A.M. was reporting complaints of physical pain. Dr. Thompson explained that A.M.'s complaints were

considered "somatic complaints," which are "fairly common" in sexual abuse victims. *Id*. at 303, 305. When asked if the terms "somatic" or "psychosomatic" would be used when a patient is misleading a doctor about pain, Dr. Thompson replied, "No, I would not use that term." *Id*. at 305. She continued, "[I]t's actual physical pain that is manifested because of emotional trauma," which could be, by way of example, pelvic pain, headaches, or abdominal pain. *Id*. She testified that the "pain that the person is experiencing is real." *Id*.

[13] At the conclusion of the evidence, Alvarez-Madrigal moved for a directed verdict, which the trial court granted as to one count of Class A felony child molesting. The jury found Alvarez-Madrigal guilty of the remaining four counts of Class A felony child molesting and guilty of two counts of Class C felony child molesting. On October 1, 2015, the trial court sentenced Alvarez-Madrigal to an aggregate sixty-one-year sentence. Alvarez-Madrigal petitioned for and was granted permission to file this belated appeal.

## Discussion and Decision

[14] Alvarez-Madrigal asserts that Dr. Thompson's testimony that "And in fact some statistics will quote that less than two to three children out of a thousand are making up claims" was vouching testimony prohibited by Indiana Evidence Rule 704(b) and that the trial court erred by admitting it into evidence. A trial court has broad discretion in ruling on the admissibility of evidence, and we will disturb its rulings only where it is shown that the court abused that

discretion. *Hoglund v. State*, 962 N.E.2d 1230, 1237 (Ind. 2012). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id.*

[15] Indiana Evidence Rule 704(b) provides that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." Such vouching testimony is considered an invasion of the province of the jurors in determining what weight they should place upon a witness's testimony. *Carter v. State*, 31 N.E.3d 17, 29 (Ind. Ct. App. 2015), *trans. denied*.

[16] We disagree with Alvarez-Madrigal's claim that Dr. Thompson's testimony violated the prohibition against vouching. This court's recent decision in *Carter* provides us with some guidance. There, at defendant's trial on five counts of child molesting, the forensic examiner, Patricia Smallwood ("Smallwood"), testified, over Carter's objections, to matters including how children deal with sexual abuse, the disclosure process, and how and why children recant or retract their disclosures of abuse. *Id.* at 24. She stated that boys are more likely to retract, and that when a child retracts, it does not mean that the abuse did not happen. *Id.* She testified that frequently, by the time of disclosure, the child has been abused so many times that individual instances run together, and children have difficulty relating specific events or details. *Id.* On appeal, Carter asserted, among other things, that Smallwood's testimony constituted impermissible vouching.

[17] The *Carter* court rejected the defendant's claim, explaining:

> [S]he never mentioned [the child victim] in her testimony or made any statement or opinion regarding the truth or falsity of [the child]'s allegations of molestation. Smallwood did not purport to have any opinion regarding the case at bar, nor did she refer to any specific facts at issue. Her testimony was broad, generalized, and included reference to results of research studies.

31 N.E.3d at 29. Similarly, in *Baumholser v. State*, 62 N.E.3d 411 (Ind. Ct. App. 2016), *trans. denied*, the defendant challenged the testimony of the forensic interviewer, Molly Elfreich ("Elfreich"). There, when Elfreich was asked at trial whether all children she had interviewed would disclose immediately, Elfreich testified that "most of the time [disclosure of a crime by a child] is delayed in some way." *Id*. at 414. Baumholser did not object to this testimony. On appeal, Baumholser argued that Elfreich's testimony was vouching testimony prohibited by Indiana Evidence Rule 704(b). The *Baumholser* court determined,

> Elfreich's testimony did not relate to the truth or falsity of [the victim]'s allegations. Rather, Elfreich was making a statement about how victims of child molestation behave in general. Thus, her testimony was not improper vouching.

*Id*. at 416 (citing *Otte v. State,* 967 N.E.2d 540, 548 (Ind. Ct. App. 2012) (testimony on the general behavior of domestic violence victims "does not cross the line into impermissible vouching"), *trans. denied*).

[18] Here, in a like way, Dr. Thompson's testimony cited to a research statistic, addressing how victims of child molestation behave in general. Dr. Thompson was being asked about what percentage of children exhibit physical injury or trauma, and she replied that "about 4 to 5 percent of children who have been victims of sexual abuse will have some kind of obvious physical evidence of penetration or sexual abuse." *Tr.* at 298. The State then asked, "[D]oes that mean that all the rest of those children are making up allegations?" and Dr. Thompson replied:

> No, it doesn't mean that. It just means it's the nature of the abuse. Like I said, often the disclosure is late, injuries are subtle or even very obvious it healed by the time we get to see them. *And in fact some statistics will quote that less than two to three children out of a thousand are making up claims.*

*Id.* at 298-99. Dr. Thompson's statement was explaining that a lack of physical injuries is not indicative that a child is fabricating the abuse, and it was based on her education and experience. It was not a statement as to A.M.'s credibility. It was not an opinion regarding the truth of the allegations against Alvarez-Madrigal. It was not an opinion about, or related to, whether A.M. had been coached, and it did not concern whether A.M. was a truthful person in general. *See Robey v. State*, 7 N.E.3d 371, 380 (Ind. Ct. App. 2014) (family case manager's testimony that child victim's demeanor was "matter of fact" was general in nature, did not directly comment on whether victim's accusations were true or whether victim was a truthful person in general), *trans. denied*. Nor was Dr. Thompson's testimony a statement that a claim has been

substantiated. *See Bean v, State*, 15 N.E.3d 12, 19 (Ind. Ct. App. 2014) ("This Court has held that testimony that a claim has been substantiated constitutes an opinion regarding the truth of the allegations, thereby violating Indiana Evidence Rule 704(b)."), *trans. denied.* In sum, Dr. Thompson expressed no opinion "concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusion," Indiana Evidence Rule 704(b), and we find that Dr. Thompson's non-solicited and general statistical statement properly left the determination of A.M.'s credibility to the province of the jury. Accordingly, Dr. Thompson's testimony was not vouching testimony prohibited by Indiana Evidence Rule 704(b), and the trial court did not abuse its discretion by admitting the testimony into evidence.

[19] Moreover, even assuming that the challenged testimony by Dr. Thompson – "[S]ome statistics will quote that less than two to three children out of a thousand are making up claims" – constituted improper vouching, we find no reversible error. *Tr.* at 299. The record reflects that, immediately after Dr. Thompson made the statement, counsel for Alvarez-Madrigal objected: "This clearly calls for speculation. It's not relevant to the facts in this case." *Id.* The trial court did not expressly rule on the objection, but instead directed: "Then ask her this, ask her every question in terms of reasonable medical certainty." *Id.* Alvarez-Madrigal did not seek to strike Dr. Thompson's testimony or ask for admonishment. On appeal, the State argues that, because a party may not assert one basis at trial and other on appeal, Alvarez-Madrigal has waived his

vouching argument. *Appellant's App*. at 12 (citing *R.W. v. State*, 975 N.E.2d 407, 411 (Ind. Ct. App. 2012), *trans. denied* and *Howard v. State*, 818 N.E.2d 469 (Ind. Ct. App. 2004), *trans. denied*). Anticipating that he might face this waiver argument, Alvarez-Madrigal maintains that he preserved his claimed error, and even if he did not, it was fundamental error[4] to admit Dr. Thompson's testimony. *Appellee's Br*. at 21-22.

[20] Assuming without deciding that, as Alvarez-Madrigal claims, he properly preserved his claim that Dr. Thompson's testimony constituted impermissible vouching, we find no reversible error. We will reverse a conviction for preserved error in the admission of evidence if the error is inconsistent with substantial justice or affects the substantial rights of a party. Ind. Evidence Rule 103(a); *Hamilton v. State*, 43 N.E.3d 628, 633-34 (Ind. Ct. App. 2015) (citing *Bradford v. State,* 960 N.E.2d 871, 877 (Ind. Ct. App. 2012)), *on reh'g*, 49 N.E.3d 554 (Ind. Ct. App. 2015), *trans. denied*; *see also Norris v. State*, 53 N.E.3d 512, 524 (Ind. Ct. App. 2016) ("Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party."). In analyzing the prejudicial effect on a defendant's substantial rights

---

[4] The fundamental error doctrine provides a vehicle for the review of error not properly preserved for appeal. It is an extremely narrow exception that allows a defendant to avoid waiver of an issue, and it is available only in egregious circumstances. *Nichols v. State*, 55 N.E.3d 854, 862 (Ind. Ct. App. 2016), *trans denied*. It is error that makes "a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process, presenting an undeniable and substantial potential for harm. *Id.* (quotations omitted). Harm is not shown by the fact that the defendant was ultimately convicted; rather harm is found when error is so prejudicial as to make a fair trial impossible. *Hoglund v. State*, 962 N.E.2d 1230, 1239 (Ind. 2012).

from the erroneous admission of evidence, we look to the probable impact of the evidence on the factfinder. *Hoglund*, 962 N.E.2d at 1238. The improper admission of evidence is deemed harmless if there is substantial independent evidence of guilt supporting a conviction such that we can say there is no substantial likelihood that the questioned evidence contributed to the conviction. *Id.*

[21] Here, A.M. testified to the incidents with specificity and consistency, and, contrary to Alvarez-Madrigal's suggestion, his convictions did not rest entirely on A.M.'s uncorroborated testimony. That is, other evidence was consistent with or supported A.M.'s allegations. A.M.'s friend P.J. testified to exchanging Facebook messages and texts with A.M. about the matter, which led to P.J. sharing her concerns about A.M. with her mentor, and a report was made to DCS. *Tr.* at 78. As a result of information received by DCS, Hunt initiated an investigation and made an unannounced visit to A.M.'s home, where Hunt spoke to A.M.'s mother and to A.M. As Hunt was at the front door, explaining that she was an employee with DCS and wanted to speak with A.M. and her parents, A.M. "burst out in tears" and said she knew why DCS was at the home, and she stated "what happened," which was the first time that A.M. mentioned anything about it to her parents. *Id.* at 79. Hunt and an IMPD officer spoke to A.M., and as a result of what A.M. said, Hunt called Detective Barnett, the on-call child abuse detective, who found that immediate response was warranted because the suspect lived in proximity, "living on the same street" as A.M. *Id.* at 187-88. Hunt took A.M. and her parents to the Child

Advocacy Center for an interview, and based on what Detective Barnett heard and observed, he obtained a search warrant for Alvarez-Madrigal's residence.

[22] S.A.O. also provided testimony that was consistent with aspects of A.M.'s testimony. She stated that on June 14, after the girls had been swimming, she waited outside for A.M. for "a long time kind of" and that, when A.M. came outside, she was sad. *Id*. at 265. S.A.O. stated that A.M. wanted to go for a walk and that during the walk, A.M. began crying, told S.A.O. about something S.A.O.'s father had done to her, and asked S.A.O. to speak to her father about it. S.A.O. testified that, at some point on their walk, A.M. told her that Alvarez-Madrigal had kissed her on the neck and touched her private parts. *Id*. at 278-81. When S.A.O. was asked at trial if she spoke to her father as A.M. had asked, S.A.O. testified, "I didn't say exactly what [A.M.] said. I just said, dad, she doesn't like when you tickle her feet, stuff like that." *Id*. at 270.

[23] Dr. Thompson also provided testimony that supported A.M.'s reports of abuse. Dr. Thompson testified that A.M. presented at Riley with complaints of genital pain and explained that A.M. was experiencing "somatic complaints," which are fairly common in sexual abuse cases. *Id*. at 303, 305. She testified that the term does not mean that the patient is fabricating feelings of physical pain, as the "pain that the person is experiencing is real" and may stem from emotional trauma. *Id*. at 305.

[24] Alvarez-Madrigal urges us to find that the factual statistic to which Dr. Thompson testified "likely influenced" the jury, especially given "the

inconsistencies, contradictions and peculiarities from other parts of the trial[.]" *Appellant's Br*. at 18. This assertion is an argument that A.M.'s testimony was not entirely consistent with that of S.A.O. and her mother, who stated that they did not see or hear anything and did not observe red marks on A.M. S.A.O. also denied that her father had begged her not to tell her mother, as A.M. had testified to hearing, and S.A.O's mother stated that she did not come out of her room into the hallway, as A.M. had described, to ask what was going on. However, the fact that S.A.O. and her mother – who were Alvarez-Madrigal's daughter and wife, respectively – denied hearing or seeing anything happen does not mean that A.M. was inconsistent. It means that there was a witness credibility determination to be made, and, here, the jury believed A.M.

[25] The record before us indicates that there was substantial independent evidence of guilt supporting Alvarez-Madrigal's convictions. We do not find that Dr. Thompson's isolated factual statistic, which was not elicited and was spontaneously offered, likely had substantial influence on the verdict.[5] *See Hoglund,* 962 N.E.2d at 1238 (improper admission of evidence is harmless error if conviction is supported by substantial independent evidence of guilt satisfying

---

[5] We note that Alvarez-Madrigal, in arguing that admission of Dr. Thompson's testimony was not harmless, asserts that "another instance of vouching occurred" at trial, during Detective Flynn's testimony when she stated that A.M. had disclosed during the interview matters in the nature of a "sexual assault" and that criminal charges are not always filed in every case that is investigated. *Appellant's Br*. at 20-21. Alvarez-Madrigal suggests that, by this testimony, the State was attempting "to persuade the jury that A.M.'s allegation of sexual assault was credible." *Id*. at 21. Alvarez-Madrigal did not object at trial to the now-challenged testimony, nor does he provide case law or support for the assertion that Detective Flynn's testimony constituted vouching. The State asserts, and we agree, that Alvarez-Madrigal has waived any argument with regard to Detective Flynn's testimony. Ind. Appellate Rule 46(A)(8).

reviewing court that there is no substantial likelihood the challenged evidence contributed to conviction); *Norris*, 53 N.E.3d at 525 (finding that interviewer's testimony stating that she found "indicia of reliability" to be present in child victim's testimony was vouching, but holding single instance of improperly admitted testimony did not affect defendant's substantial rights and was harmless). Accordingly, the trial court did not commit reversible error when it admitted Dr. Thompson's testimony over Alvarez-Madrigal's objection.

[26] Affirmed.

[27] Robb, J., concurs.

[28] Barnes, J., concurs in result with separate opinion.

Argumendo Alvarez-Madrigal,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

Court of Appeals Case No.
49A02-1601-CR-162

**Barnes, Judge, concurring in result.**

[29] I concur in result here. I do not believe Alvarez-Madrigal adequately preserved his claim on appeal that Dr. Thompson gave impermissible vouching testimony. He objected to the testimony on the basis that it was "speculation" and "not relevant . . . ." Tr. p. 299. A party cannot object on one basis at trial and seek reversal on appeal on a different ground. *Boatner v. State*, 934 N.E.2d 184, 187 (Ind. Ct. App. 2010). Thus, in order for Alvarez-Madrigal to prevail on his unpreserved claim that Dr. Thompson's testimony was impermissible vouching, he must establish that it was fundamental error. *See Absher v. State*, 866 N.E.2d 350, 355 (Ind. Ct. App. 2007). I believe Dr. Thompson's testimony was erroneous but not fundamental error.

[30] Despite my colleagues' thoughtful opinion, I am convinced that a similar vouching question to the one here was addressed, explained, and held improper

by our supreme court in *Sampson v. State*, 38 N.E.3d 985 (Ind. 2015), and this court in *Hamilton v. State*, 43 N.E.3d 628 (Ind. Ct. App. 2015), *aff'd on r'hg*, *trans. denied*. I am the author of *Hamilton*, and I stand behind it without reservation. I also understand that some cases may be distinguishable to allow some of the testimony provided here by Dr. Thompson. I also understand that crimes against children are particularly heinous. Our society as a whole—including investigators, prosecutors, and the judiciary—are understandably horrified by these crimes. I am, too.

[31] The flip side of that coin, however, is that persons accused of such offenses face a stigma associated with no other type of crime, and they are entitled to the full protection of the law before they may be convicted. When we put in place a set of rules to govern the admission of evidence in these types of cases, we do so because of our obligation under the law to presume innocence and ensure that defendants receive a fair trial, regardless of the heinousness of the allegations. Dating back to cases such as *Lannan v. State*, 600 N.E.2d 1334 (Ind. 1992), and *Modesitt v. State*, 578 N.E.2d 649 (Ind. 1991), Indiana courts have constructed a pattern of rules to address the appropriate ways to try these sorts of cases.

[32] Most recently, in *Sampson*, our supreme court held that expert witnesses cannot testify as to the general signs that a child has or has not been coached and then testify as to whether a particular child exhibited any such signs, unless the defendant has opened the door to such testimony. *Sampson*, 38 N.E.3d at 991-92. As the court explained,

> when a jury is presented with expert testimony concerning
> certain coaching behaviors, the invited inference that the child
> has or has not been coached because the child fits the behavioral
> profile is likely to be just as potentially misleading as expert
> testimony applying the coaching behaviors to the facts of the case
> and declaring outright that a given child has or has not been
> coached.

*Id.* at 991. The court overruled previous cases from this court in reaching this decision: *Kindred v. State*, 973 N.E.2d 1245 (Ind. Ct. App. 2012), *trans. denied*, and *Archer v. State*, 996 N.E.2d 341 (Ind. Ct. App. 2013), *trans. denied*. The *Sampson* court did not reverse the defendant's child molestation conviction, however, because the defendant did not object to the testimony and the error was not fundamental, in light of the victim's testimony. *Sampson*, 38 N.E.3d at 992-93. The *Sampson* opinion relied heavily upon *Hoglund v. State*, 962 N.E.2d 1230, 1237 (Ind. 2012), which held that allowing testimony that a child is not prone to exaggerate or fantasize about sexual matters is "indirect vouching testimony [that] is little different than testimony that the child witness is telling the truth."

[33] In *Hamilton*, we addressed a case in which there was in fact a timely objection to the type of improper vouching testimony prohibited by *Sampson*. We rejected the trial court's ruling that the defendant had opened the door to such testimony because he had asked the two alleged victims whether anyone had told them what to say in court, noting that both victims had said no and that no other evidence of alleged coaching was presented. *Hamilton*, 43 N.E.3d at 633. We explained that, for a defendant to open the door to otherwise inadmissible

evidence, the defendant "'must leave the trier of fact with a false or misleading impression of the facts related.'" *Id.* at 632-33 (quoting *Beauchamp v. State*, 788 N.E.2d 881, 896 (Ind. Ct. App. 2003)). "Merely asking the witnesses whether they had been told what to say is not equivalent to presenting evidence that they had been told what to say, or creating a false impression in the jury that they had been." *Id.* at 633. A false impression may be created if a child recants an abuse claim during trial, or if the defendant attempts to argue or present evidence that a child is not acting like a sexual abuse victim. *Id.* (citing *Steward v. State*, 652 N.E.2d 490, 499 (Ind. 1995)). Ultimately, we reversed the defendant's convictions, stating:

> If there is to be a rule barring vouching testimony . . . then it is extremely difficult to imagine a scenario in which such testimony, where an objection to it was raised at trial, is harmless in a case such as this where a conviction depends entirely upon assessing the credibility of the alleged victim. Otherwise there would seem to be little point in having such a rule.

*Id.* at 634. Clearly, the recent trend in the case law is to restrict both direct and indirect forms of vouching for a child witness's credibility unless the door has been opened to such vouching. Moreover, the door must be opened by something more than simply questioning the witness and attempting to poke holes in his or her testimony, which is always the point of cross-examination.

[34] Here, Alvarez-Madrigal cross-examined A.M. about possible inconsistencies in her testimony and conflicts with pre-trial statements. I do not believe this amounted to opening the door for vouching testimony. And, I disagree with

my colleagues that Dr. Thompson's testimony was permissible, especially with respect to her statistical statement about the number of children who purportedly make up molestation claims. That kind of testimony is, in my mind, the type of indirect vouching addressed and rejected in *Hoglund*, *Sampson*, and *Hamilton*. Even if Dr. Thompson's testimony was not directly tied to A.M., what other conclusion could a jury draw from this testimony other than, "there's a very small chance this child is making these things up"?

[35] A number of other courts take the same dim view of statistical vouching evidence such as this. For example, in *Wheat v. State*, 527 A.2d 269 (Del. 1987), the Delaware Supreme Court reversed a molestation conviction after an expert witness on child abuse testified about typical behaviors exhibited by an abuse victim, and also testified "that in general, between thirty percent and forty percent of children recant, alter, or otherwise minimize their original allegations of sexual abuse, but that fewer than five percent recant and maintain the altered statement." *Wheat*, 527 A.2d at 271. The court flatly rejected the admissibility of this testimony. It stated, "[t]o the extent such expert testimony is given in general terms and directed to behavior factors in evidence, it is admissible. To the extent it attempts to quantify the veracity of a particular witness or provide a statistical test for truth telling in the courtroom, *it is clearly unacceptable*." *Id.* at 275 (emphasis added). The court held that the expert had "impermissibly invaded the credibility province of the trier of fact in 'lie detector' fashion." *Id.* *See also United States v. Brooks*, 64 M.J. 325, 329-30 (C.A.A.F. 2007) (reversing military convictions for indecent liberties with a child because of expert's

plainly erroneous testimony that only two to five percent of child sex abuse allegations were fabricated; convictions were reversed despite no objection to the testimony); *State v. MacRae*, 677 A.2d 698, 702 (N.H. 1996) (holding expert testimony that seventy to eighty percent of males treated at a certain substance abuse facility also attended by victim had been sexually abused was erroneous but was harmless because defendant had presented similar evidence); *State v. Lindsey*, 720 P.2d 73, 75 (Ariz. 1986) (reversing incest convictions based on expert's inadmissible testimony that only "a very small proportion" of incest allegations are false and stating, "trial courts should not admit expert testimony that quantifies the probabilities of the credibility of another witness"); *Aguirre v. State*, 379 P.3d 1149 (Kan. Ct. App. 2016)[6] (holding defendant received ineffective assistance of counsel and vacating convictions for rape and indecent liberties with a child where trial counsel did not object to expert testimony that "very few children lie about sexual abuse" and that ninety-three percent of children who recant an abuse allegation are lying about the recantation).

[36] In sum, I believe this court should unequivocally hold that statistical evidence about the possibility a witness is lying invades the province of the fact finder and is inadmissible vouching. That said, I do not believe Alvarez-Madrigal adequately preserved his claim of error in this case. I also cannot say he established fundamental error, given A.M.'s detailed testimony and other

---

[6] This case was not published; however, unlike in Indiana, there is not an absolute bar in the Kansas rules of appellate procedure upon citing it as precedent. *See* Kan. Sup. Ct. R. 7.04.

evidence in the record that corroborated it. *See Sampson*, 38 N.E.3d at 992-93.

On that basis, I vote to affirm Alvarez-Madrigal's convictions.