


FILED
Jul 02 2024, 8:42 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N  T H E

# Court of Appeals of Indiana

Micah Henson,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

July 2, 2024

Court of Appeals Case No.
23A-CR-2550

Appeal from the Morgan Superior Court

The Honorable Dakota VanLeeuwen, Judge

Trial Court Cause No.
55D01-2101-F3-154

---

**Opinion by Judge Vaidik**
Judges May and Kenworthy concur.

**Vaidik, Judge.**

## Case Summary

[1] Micah Henson appeals his convictions for two counts of Level 4 felony child molesting. Following the victim's testimony at trial, a detective testified about his observations throughout his career of how children deal with and disclose sexual abuse. Henson contends this testimony impermissibly vouched for the victim's credibility.

[2] Vouching testimony is prohibited by Indiana Evidence Rule 704(b), which provides that witnesses cannot testify to opinions about intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness testified truthfully; or legal conclusions. In a trial for sexual abuse of a child, witnesses generally may not offer an opinion about the victim's credibility or the truthfulness of the abuse allegations. But under our current case law, a witness may testify about how child sexual-abuse victims typically behave, so long as they limit their testimony to victims as a general class. While we have reservations about this standard and encourage our Supreme Court to reexamine it, our precedent makes clear that there was no error in the admission of the detective's testimony here. We affirm.

## Facts and Procedural History

[3] Micah and Ginny Henson married in 2002 and had two children: T.H., born in March 2006, and K.H., born in August 2007. Henson and Ginny divorced in March 2013, after which Ginny was awarded sole physical and legal custody

and Henson had parenting time every other weekend. Henson remarried, and his new wife and her children moved in with him in December 2018. By May 2020, Ginny stopped taking K.H. and T.H. to visit Henson. On September 11, she petitioned to modify Henson's parenting time, alleging there was no bedroom for K.H. or T.H. in his house, Henson and his new wife were verbally abusive, and K.H. and T.H. "d[id] not want to visit or stay with" Henson. Tr. Vol. III p. 34.

[4] On October 1, 2020, K.H., then thirteen years old, called Ginny around lunchtime and asked her to pick her up from school. After getting into Ginny's car, K.H. told her Henson "had touched [her] inappropriately." *Id.* at 72. That same day, Ginny reported K.H.'s disclosure to law enforcement. Detective Mark Anderson was assigned to the case and interviewed K.H. a few weeks later. K.H. told Detective Anderson about five incidents of sexual abuse by Henson that occurred over several years.

[5] The State charged Henson with two counts of Level 1 felony child molesting, two counts of Level 4 felony child molesting, and two counts of Level 4 felony incest. In preparation for trial, defense counsel deposed K.H. in January 2022.

[6] A jury trial was held in September 2023. During its opening statement, the defense emphasized inconsistencies in K.H.'s accounts of the abuse and presented the theory that K.H. made up the allegations right after Ginny petitioned to modify Henson's parenting time so that she wouldn't have to visit him anymore.

[7] K.H. testified about each of the five incidents of sexual abuse by Henson. The first incident occurred when K.H. was ten years old. She thought it was in February because "[i]t was cold and snowy outside." *Id.* at 57. K.H. and Henson were in his bed together, and she believed T.H. was in the bed with them on the other side of Henson. K.H. was asleep when she woke up to Henson "touching" her "vagina," and her pants and underwear had been pulled down. *Id.* at 58, 59. Henson was "rubbing around" her "private area" with his hand, and his finger "went inside" her. *Id.* at 59.

[8] The second incident also occurred when K.H. was ten. K.H. believed it happened around May because she'd been on summer break from school. She was again in bed with Henson and couldn't remember whether T.H. was in bed with them this time, but she thought he'd been in the living room. K.H. was trying to go to sleep when Henson pulled down her pants and underwear and "began to touch and rub around [her] private area" with his hand. *Id.* at 61. This time, Henson did not put a finger inside K.H. The next morning, while K.H., Henson, and T.H. were eating breakfast, Henson threatened K.H. that if she ever told anyone what he did, "he's going to go to jail," and "he would hurt" K.H. and T.H. *Id.* at 62.

[9] By the time of the third incident, K.H. was eleven. K.H. remembered it occurred during fall break and that "[t]he leaves were like off the trees on the ground." *Id.* at 63. She was in Henson's bed trying to fall asleep when he got into bed with her and "started touching [her] butt and [her] private area" over

her clothes. *Id.* at 64. He then put his hands under her clothes and was "groping [her] butt and rubbing around [her] vagina." *Id.* at 65.

[10] The fourth incident was when K.H. was still eleven. She thought it happened in the "winter time" because it was a couple of months after the third incident. *Id.* at 66. K.H. was in Henson's bed trying to fall asleep, and T.H. was on the floor. Henson came into the room, pulled K.H.'s pants down, and "put his mouth on [her] private area" and "was licking it." *Id.* at 67, 68. K.H. said her eyes had been closed, but she knew it was Henson because she could feel his beard.

[11] The fifth and final incident occurred when K.H. was twelve. K.H. remembered it happened in the summer, "not summer break" but while she "was in school," between August and October. *Id.* at 68. K.H. testified that she and T.H. had made a fort in Henson's bedroom, and she was in the fort trying to go to sleep, but T.H. was no longer in the room. Henson pulled K.H. out of the fort and onto an air mattress and pulled down her shorts, underwear, shirt, and bra. He used one hand to "touch[] [her] breasts" and was "rubbing around" her "private area" with the other hand. *Id.* at 70, 71. He also "put his mouth on [her] breasts" and on her "vagina." *Id.* at 70, 94.

[12] On cross-examination, defense counsel questioned K.H. about the following discrepancies between her original statement to Detective Anderson, her January 2022 deposition, and her testimony on direct examination: whether T.H. had been in the bed with Henson and K.H. during the first incident and whether K.H. was completely asleep or falling asleep when it began; whether

Henson made the threat to K.H. after the second incident or the first; what month the third incident occurred, what K.H. was wearing, whether T.H. had been at the house, and whether K.H. met Henson's new wife after the third incident or the fifth; what season the fourth incident occurred and whether K.H.'s eyes were open or closed during it; and whether K.H. was completely asleep or falling asleep when the fifth incident began, whether she'd already been on the air mattress or Henson pulled her onto it, and whether Henson put his mouth on her vagina.

[13] At the close of K.H.'s testimony, the court asked her several questions submitted by the jury. One question was, "When these incidents was [sic] happening and your brother was also in the room, did you yell or say something to [Henson] that he was doing wrong so your brother could hear something wasn't right?" *Id.* at 98. K.H. said she hadn't. On redirect, the State asked K.H. whether she yelled out or screamed for help during any of the times Henson touched her, and K.H. said she didn't because she felt like she couldn't move.

[14] Detective Anderson was the State's final witness. He testified as follows about his training and experience working with child sexual-abuse victims. At the time of trial, he'd been in law enforcement for thirty-two years and a detective for twelve; he'd taken courses on investigating crimes against children and on conducting forensic interviews of children; he'd worked over one hundred cases involving sex crimes with child witnesses or victims; and he'd observed or

conducted over one hundred forensic interviews of children, over seventy to eighty of which he completed himself.

[15] The State questioned Detective Anderson about his observations throughout his investigations of child sexual-abuse cases. The State first asked about how children understand questions, leading to the following exchange:

> Q. In your experience in interviewing children, do they understand questions the same way adults do?
>
> [DEFENSE COUNSEL]: Your Honor, I'm going to object. This is speculation, it's vouching, it's irrelevant to this.
>
> THE COURT: State?
>
> [THE STATE]: I think it's relevant at this point, Your Honor, he's talking about his experience as a forensic interviewer, and the necessity of using certain questions to interview kids. I think he can explain why that is based on his training and experience.
>
> THE COURT: He can explain his training and experience. Carry on.
>
> A. So, you have to be careful when you ask questions to children, because they're not going to understand, or they might understand it as something different. I've had a situation where I had to ask a question a couple of different times, and they finally understand it, just because of their learning abilities aren't as developed as an adult. You might have run into some adults you have to ask a question two or three times too, also. You can see as a child, it's really difficult to understand what somebody's saying, especially in certain circumstances.

*Id.* at 115-16.

[16]    The State also asked Detective Anderson about children's concept of time, which transpired as follows:

>   Q. In your experience in watching interviews and conducting them yourself, have you noticed anything about kids and their concept of time?
>
>   A. Yes.
>
>   [DEFENSE COUNSEL]: Your Honor, again, I'm going to object. There's no foundation for this. I don't think it's relevant. I think it's vouching for explaining why these sort of fantastic time periods that the child's testified to are somehow still truthful. It's not helpful to the jury. It's going to confuse them.
>
>   THE COURT: State?
>
>   [THE STATE]: Judge, again, it goes to explaining the qualifications of Detective Anderson, his experience and his training. I think that it is relevant in this case. And I think that it's something the jury should be able to hear and it would be helpful for them.
>
>   THE COURT: We're still in his qualifications, so I'll allow it for his qualifications. You've not made any references to this case at this time.
>
>   [THE STATE]: Thank you, Judge.
>
>   A. So in our training as a forensic interviewer, we are trained to get a, gear a certain time period of the year. Children don't

remember exact times. So we try to give them a time period, if it's cold outside, or were they in school, or, something else that might give them an understanding of the time period that they're talking about. Because their sense of time is different than adults['] sense of time.

[DEFENSE COUNSEL]: Object. He's giving opinions. There's been no foundation for it.

THE COURT: I will carry on your continued objection.

*Id.* at 117-18.

[17] The State next questioned Detective Anderson about how and when child victims disclose sexual abuse. He testified that, in his experience, delayed disclosure is much more common than immediate disclosure. He explained that, as he learned in his training, a child may delay disclosure for several reasons, including fear, embarrassment, feeling at fault for what happened, or someone threatening them not to tell. The State then asked Detective Anderson, "In your training and your experience in investigating sex crimes involving children, is it common for kids to yell out, or cry out when they're being assaulted?" *Id.* at 119. Detective Anderson testified that in his twelve years as a detective, he couldn't remember an incident where the child yelled out during the abuse. Defense counsel did not object to this line of questioning.

[18] Detective Anderson testified further about delayed disclosures. He explained that children tend to come forward more when the abuser is a stranger rather than a relative. The State asked him whether a delayed disclosure can affect a

child victim's ability to remember when the abuse happened, and he said he's had cases where a child discloses multiple incidents that occurred over a long period, and when the child is being interviewed, they get confused on when each incident occurred. For example, they might mix up the details of what happened in the first incident with what happened in the third incident. Defense counsel did not object to this testimony.

[19] The jury acquitted Henson of the two counts of Level 1 felony child molesting and two counts of Level 4 felony incest and convicted him of both counts of Level 4 felony child molesting. The trial court sentenced Henson to eight years for each count, to be served consecutively, for a total term of sixteen years.

[20] Henson now appeals.

## Discussion and Decision

### I. Detective Anderson's testimony was not impermissible vouching

[21] Henson first argues the trial court erred in allowing Detective Anderson to testify about "child abuse victim characteristics." Appellant's Br. p. 11. Generally, trial courts have broad discretion in ruling on the admissibility of evidence, and we review only for an abuse of that discretion. *Hoglund v. State*, 962 N.E.2d 1230, 1237 (Ind. 2012), *reh'g denied*. An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances. *Id.*

Henson contends Detective Anderson "impermissibly vouched for K.H.'s testimony." Appellant's Br. pp. 9-10. Vouching is prohibited by Indiana Evidence Rule 704(b), which provides that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; **the truth or falsity of allegations**; **whether a witness has testified truthfully**; or legal conclusions." (emphases added). Such testimony invades the province of the jury in determining what weight to give a witness's testimony. *Gutierrez v. State*, 961 N.E.2d 1030, 1034 (Ind. Ct. App. 2012). "[I]t is essential that the trier of fact determine the credibility of the witnesses and the weight of the evidence." *Id.*

Henson cites two child-molesting cases in which our Supreme Court found the testimony at issue was impermissible vouching: *Hoglund*, where witnesses testified that the victim wasn't prone to exaggerate or fantasize about sexual matters, and *Sampson v. State*, 38 N.E.3d 985 (Ind. 2015), where a witness testified that the victim hadn't exhibited signs of being coached. In both cases, our Supreme Court explored the thin line between direct and indirect vouching testimony. The *Hoglund* Court found that although none of the witnesses' statements "took the direct form of 'I believe the child's story,' or 'In my opinion the child is telling the truth,'" they were nonetheless comments on the child's truthfulness. 962 N.E.2d at 1238. The Court concluded this kind of testimony is "an indirect but nonetheless functional equivalent of saying the child is 'telling the truth'" and thus contradicts Rule 704(b). *Id.* at 1236-37. In the context of coaching, the *Sampson* Court concluded "the subtle distinction

between an expert's testimony that a child *has or has not been coached* versus an expert's testimony that the child *did or did not exhibit any 'signs or indicators' of coaching* is insufficient to guard against the dangers that such testimony will constitute impermissible vouching as we expressed in *Hoglund*." 38 N.E.3d at 991-92; *see also Hamilton v. State*, 43 N.E.3d 628, 633 (Ind. Ct. App. 2015), *aff'd on reh'g*, 49 N.E.3d 554, *trans. denied*. The *Sampson* court found the risk of the jury misapplying such evidence is the same whether the witness "expresses an explicit opinion that coaching has or has not occurred or merely allows the jury to draw the final conclusion." 38 N.E.3d at 991.

[24] But our courts have reached a different conclusion where witnesses limited their testimony to statements about children generally rather than testifying about the particular victim's behavior or conduct. This Court has repeatedly found no Rule 704(b) violation where a witness testified about how child sexual-abuse victims behave in general without making a statement about the specific victim. *See Ward v. State*, 203 N.E.3d 524 (Ind. Ct. App. 2023); *Hobbs v. State*, 160 N.E.3d 543, 555 (Ind. Ct. App. 2020) ("Because [the nurses] did not testify about [the victims'] credibility or the truth or falsity of their allegations but testified how child-molesting victims behave in general, there is no impermissible vouching . . . ."), *trans. denied*; *Alvarez-Madrigal v. State*, 71 N.E.3d 887 (Ind. Ct. App. 2017), *trans. denied*; *Baumholser v. State*, 62 N.E.3d 411 (Ind. Ct. App. 2016), *trans. denied*; *Carter v. State*, 31 N.E.3d 17 (Ind. Ct. App. 2015), *reh'g denied*, *trans. denied*. And our Supreme Court seemed to endorse this view in a recent case, albeit in a footnote. *See Hayko v. State*, 211 N.E.3d 483, 487 n.2

(Ind. 2023) (finding trial court did not abuse its discretion in denying defendant's Rule 704(b) objection because "[t]he forensic interviewer's answer did not relate to the truth or falsity of [the victim]'s allegations; it was merely an observation rooted in her experience regarding the behavior of child victims generally"), *reh'g denied*, *cert. denied*.[1]

[25] Unlike the witnesses in *Hoglund* and *Sampson*, Detective Anderson didn't testify specifically about K.H.'s credibility or the truth of her allegations against Henson. Rather, as in *Hobbs* and the like, Detective Anderson's testimony was limited to how children generally react to and disclose abuse. As our case law makes clear, this is not vouching testimony prohibited by Rule 704(b).

[26] This is not to say that our precedent on vouching in child sexual-abuse cases hasn't been met with resistance. In *Alvarez-Madrigal*, a pediatrician testified that "about 4 to 5 percent of children who have been victims of sexual abuse will have some kind of obvious physical evidence of penetration or sexual abuse" and that "some statistics will quote that less than two to three children out of a thousand are making up claims." 71 N.E.3d at 893. Finding this testimony was merely a statement about how child sexual-abuse victims behave in general— not an opinion about the victim's credibility, the truth of the allegations, or whether the victim had been coached or was a truthful person—the majority held that the testimony "properly left the determination of [the victim]'s

_____

[1] In *Hayko*, neither party made an argument under *Steward v. State*, 652 N.E.2d 490 (Ind. 1995). See below.

credibility to the province of the jury" and thus was not impermissible vouching. *Id.*

[27] In a separate opinion, Judge Barnes disagreed with the majority that the pediatrician's testimony was not impermissible vouching. *Id.* at 896 (Barnes, J., concurring in result). He wrote that the testimony—especially the statistic about the number of children who make up claims of sexual abuse—was the kind of indirect vouching precluded by *Hoglund*, *Sampson*, and *Hamilton*. *Id.* at 897. As Judge Barnes put it, "Even if [the pediatrician]'s testimony was not directly tied to [the victim], what other conclusion could a jury draw from this testimony other than, 'there's a very small chance this child is making these things up'?" *Id.* at 897.

[28] We find merit in Judge Barnes's concerns. Child sexual-abuse cases often rely on the uncorroborated testimony of the victim, meaning the State's entire case hinges on the victim's credibility. When an officer opines immediately after a victim's testimony that her behavior after the abuse or while testifying is common among other child sexual-abuse victims, the inevitable effect is to bolster the truth of the victim's allegations. The State contends this evidence of typical victim behaviors is admissible to "help[] the jury evaluate [the victim]'s credibility." Appellee's Br. p. 16 n.2. But testimony that "helps" a jury by implying the victim is telling the truth because she acted in accordance with expected behaviors is vouching.

[29] That said, evidence of victim behavior patterns isn't always inadmissible. Child sexual-abuse cases are one of the rare times where the trial court may allow testimony explaining common reactions of victims or providing context for a victim's demeanor during their testimony.[2] Historically, this evidence was subject to the admissibility restrictions set forth in *Steward v. State*, 652 N.E.2d 490 (Ind. 1995). Under *Steward*, if a victim exhibited a seemingly unexpected behavior, such as delayed disclosure, then an expert witness could testify that such behavior was consistent with Child Sexual Abuse Accommodation Syndrome or "similar descriptions of 'typical' behavior profiles or patterns, whether or not termed 'syndromes.'" *Id.* at 493, 499. First, however, the defense had to open the door to the testimony by highlighting a specific unexpected behavior in an effort to call the victim's credibility into question. *Id.*

[30] Since *Steward*, though, our case law has strayed from these stringent requirements. In some cases, this Court found *Steward* didn't apply simply because the behavioral evidence wasn't offered as scientific testimony or referred to as a "syndrome" or "profile." *See, e.g.*, *Lyons v. State*, 976 N.E.2d

---

[2] For example, our case law doesn't allow testimony of how the typical burglary victim reacts. But in some cases, we may allow accrediting testimony from an **expert** where issues outside the jurors' common experience complicate their credibility evaluation. This includes expert testimony about both common post-trauma conduct and the clinical significance of a victim's demeanor while testifying at trial. *See, e.g.*, *Simmons v. State*, 504 N.E.2d 575, 578-79 (Ind. 1987) (allowing expert testimony that victim's behavior was consistent with rape trauma syndrome); *Otte v. State*, 967 N.E.2d 540, 547-48 (Ind. Ct. App. 2012) (endorsing use of expert testimony about battered woman syndrome to explain victim recantation), *trans. denied*; *Carter v. State*, 754 N.E.2d 877, 882-83 (Ind. 2001) (permitting psychologist specializing in autism to testify that "autistic children find it difficult to deliberately deceive others"), *reh'g denied*. Here, Detective Anderson wasn't offered as an expert by the State or determined to be an expert by the trial court.

137, 142-43 (Ind. Ct. App. 2012); *State v. Velasquez*, 944 N.E.2d 34, 43 n.3 (Ind. Ct. App. 2011), *trans. denied*. In other cases, this Court found the defendant opened the door simply by generally attacking the victim's credibility rather than by emphasizing an unexpected behavior. *See Ward*, 203 N.E.3d at 531; *Pierce v. State*, 135 N.E.3d 993, 1005 (Ind. Ct. App. 2019), *trans. denied*. *Contra Ward*, 203 N.E.3d at 535 (Vaidik, J., concurring in part) ("Merely alleging the victim is not credible does not warrant admission of [testimony that nightmares and self-mutilation are typical of child sexual-abuse victims] under *Steward*, which requires a challenge to specific unexpected behavior exhibited by the victim."); *Alvarez-Madrigal*, 71 N.E.3d at 897 (Barnes, J., concurring in result) ("[T]he door must be opened by something more than simply questioning the witness and attempting to poke holes in his or her testimony, which is always the point of cross-examination."). Other panels of this Court have avoided a *Steward* analysis entirely, instead considering behavioral evidence in only a vouching context without inquiring into whether the defendant opened the door to the evidence. *See, e.g.*, *Alvarez-Madrigal*, 71 N.E.3d at 892-93; *Carter*, 31 N.E.3d at 29-30. Because of these inconsistent applications of our case law, we ask our Supreme Court to clarify whether *Steward* remains good law or is no longer part of a vouching analysis.

[31]    Nevertheless, because Detective Anderson's testimony was about children generally rather than K.H. specifically, there was no vouching under our current precedent, and the trial court did not abuse its discretion in admitting Detective Anderson's testimony.

## II. There is no double-jeopardy violation

[32] Henson also argues his convictions for two counts of the same offense constitute double jeopardy. He contends the charges for two counts of Level 4 felony child molesting were "multiplicitous" and that his convictions for both counts violate his "right against being punished for the same offense twice." Appellant's Br. pp. 20, 22. In support of this argument, Henson exclusively relies on cases where the defendant was charged with multiple offenses for the same act or transaction. *See id.* at 20-21 (citing *Blockburger v. United States*, 284 U.S. 299 (1932), and *Richardson v. State*, 717 N.E.2d 32 (Ind. 1999)). But the two counts of Level 4 felony child molesting were not for the same act or transaction—K.H. described five incidents of sexual abuse, and the State clearly explained in its closing argument that one count of Level 4 felony child molesting was for the second incident, and the other count was for the third. *See* Tr. pp. 163-64. Henson's convictions for two separate acts of child molesting do not constitute double jeopardy. He is not being punished twice for the same offense.

[33] Affirmed.

May, J., and Kenworthy, J., concur.

ATTORNEY FOR APPELLANT

Glen E. Koch II
Boren, Oliver & Coffey, LLP
Martinsville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana