

FILED

Feb 04 2019, 9:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Amy D. Griner
Griner & Company
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jabreeh Cash Davis-Martin, *Appellant-Defendant,* v. State of Indiana, *Appellee-Plaintiff* | February 4, 2019 Court of Appeals Case No. 71A05-1712-CR-2963 Appeal from the St. Joseph Superior Court The Honorable Elizabeth C. Hurley, Judge Trial Court Cause No. 71D08-1603-MR-002 |

**Vaidik, Chief Judge.**

## Case Summary

Jabreeh Cash Davis-Martin was convicted of murder for the brutal beating death of Jodie Henderson in South Bend in January 2016. He now appeals his

conviction on a variety of grounds as well as his maximum sentence of sixty-five years. Specifically, Davis-Martin contends that (1) the State withheld his cell-phone records in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), (2) the State violated his due-process rights by not correcting a detective's false testimony, (3) the trial court erred in not supplementing the pattern jury instruction on impeachment by prior inconsistent statements, (4) the trial court admitted evidence that he told his mother he did not want to talk to the police in violation of his Fifth Amendment privilege against self-incrimination, (5) the evidence is insufficient to support his conviction, and (6) the trial court erred in not identifying three mitigators. We affirm.

# Facts and Procedural History

[2] Around 6:30 p.m. on January 15, 2016, Jodie and his aunt, Donna Forrest, went to Felisha Sconiers's house on Sorin Street in South Bend. Felisha's mother and son, Davis-Martin, also lived in the house, with Davis-Martin staying in the basement. Shortly after arriving at the Sorin Street house, Jodie suggested buying alcohol. Jodie, Donna, and Felisha went to the liquor store and bought some vodka. Upon returning to the house, they sat around the kitchen table and drank. Throughout the evening, other people were coming and going, including Davis-Martin and his friend, Ricky Jackson. While Jodie, Donna, and Felisha were at the kitchen table, Jodie, an openly gay man, told Felisha that he "want[ed]" her son, Davis-Martin. Tr. Vol. II p. 32; Ex. 278 (video). Felisha told Jodie not to talk about her son, adding "you can talk to

me about my husband, though, you can have that motherfu**er." Ex. 278. Jodie responded that he didn't want her husband, he was "gonna git [her] son." *Id.* Felisha told Jodie to stand up, because she was going to "kick [him] in [the] a** right now." *Id.* Jodie then asked Felisha what made her think that Davis-Martin "ain't in love with me too?" *Id.* Felisha responded, "I know he ain't." *Id.* When Jodie called Davis-Martin his "husband," Felisha, upset, warned him not to talk about her son "like that." *Id.*

[3] As the evening wore on, Jodie passed out. It was later determined that his blood-alcohol content had been in the range of 0.25. Tr. Vol. III p. 31. Donna was unable to rouse Jodie, so around 11:45 p.m. Davis-Martin, who was getting ready to go out, moved Jodie to the living-room couch. Donna put Jodie's two cell phones and car keys in his coat pocket and then put his coat on top of him as a blanket. After confirming with Felisha that Jodie could sleep on the couch, Donna went home. As she left, she saw Davis-Martin standing at a car talking to someone.

[4] Meanwhile, Felisha went to sleep on the couch near Jodie. At some point, Felisha heard Jodie get up and say he was leaving.

[5] Sometime around 2:00 to 3:00 a.m., Ricky returned to the Sorin Street house because he had left his coat there. According to Ricky, the outside of the house "didn't look right" because there was "like blood and stuff." Tr. Vol. II p. 207. Ricky also saw "a dude sitting up across the street" on the curb. *Id.* at 208. After he got his coat and was leaving, Ricky noticed that the man across the

street (he did not know who it was, but he could tell it was not Davis-Martin) was mumbling that he wanted to go home. *Id.* at 212. Ricky did not help the man, however, because he had just been released from prison two weeks earlier and did not want to get in trouble.

[6] Shortly before 7 a.m., police officers from the South Bend Police Department were dispatched to the 1200 block of East Sorin Street on a report of an unresponsive male in the street. Upon arrival, the officers found Jodie lying face down in the street across from the Sorin Street house. Jodie, who had significant head trauma, did not have a coat on, and he was missing his left shoe. Paramedics arrived and pronounced him dead.

[7] There was a good deal of evidence for the officers to collect at the scene. At the Sorin Street house, the officers observed blood in the snow in the front yard, on the cement walkway leading to the house, and on the front porch. More blood was found near Jodie's body across the street from the house. The officers observed that a paver had been removed from the top of a retaining wall and was on the ground near Jodie's body. In addition, the porch railing by the front door of the house had been broken away from the house and was leaning out toward the yard. One of the spindles was broken, with half of it missing. In the front yard, the officers found the missing half of the spindle with blood on it as well as part of a broken chair, a piece of black material, and a piece of circular foam with blood on it.

[8] The snow also contained clues about Jodie's death. The officers found several footprints in the snow that had been made by two different shoes. The tread pattern of one was consistent with Nike Air Force 1 shoes. The officers also found an impression in the snow that resembled a folding chair with a circular seat. Finally, the officers found drag marks in the snow leading away from the Sorin Street house toward Jodie's body across the street.

[9] Inside the Sorin Street house, the officers found Jodie's missing left shoe underneath a recliner in the living room. The officers also found a pile of trash at the bottom of the basement stairs. Inside the pile of trash was a pair of Nike Air Force 1 shoes. Later forensic testing revealed that Davis-Martin's DNA was on the shoes. A comparison of the impressions from the Nike Air Force 1 shoes and the footprints in the snow showed that they were a match. Tr. Vol. III p. 62. The officers also found a folding chair in the basement that looked like the impression in the snow. The officers brought the intact chair outside, and it matched the impression. The broken chair part and piece of black material found in the yard also matched the chair found in the basement.

[10] Later that day, South Bend Police Department Detective Brian Cook interviewed Felisha. During the interview, Detective Cook told Felisha that he wanted to interview her son. Felisha then called Davis-Martin from the interview room and told him that the police wanted him to come to the station "because they found Jodie dead across the street, and they want[ed] to talk to everybody who was [at the Sorin Street house] last night." Tr. Vol. II p. 66. Davis-Martin replied, "I ain't going down there to talk to nobody." *Id.* In a

second call happening "immediately after," Davis-Martin told his mother that he did not have time to talk to the police because he was at work. *Id.*; Tr. Vol. IV pp. 16-17. It was later learned that Davis-Martin did not go to work that day.

[11] An autopsy performed on January 17 found multiple abrasions on Jodie's hands, arms, legs, torso, back, and head. There were also lacerations to his head, which indicated that the skin had been split open by forceful impacts. There was a fracture to the outer layer of his skull and to a rib. According to the forensic pathologist, the manner of death was homicide, and the cause of death was multiple injuries, "including blunt and chop injuries." Tr. Vol. III p. 23. Jodie's alcohol consumption and exposure to the cold contributed to his death. *Id.* at 22.

[12] The investigation of Jodie's death continued throughout February and March. On February 18, Davis-Martin was arrested on an unrelated charge and incarcerated in the St. Joseph County Jail. Around this same time, Detective Cook interviewed Davis-Martin. Tr. Vol. II pp. 218-20; Tr. Vol. IV p. 13. On February 21, Davis-Martin placed a phone call from jail, which was recorded. During the call, Davis-Martin stated that he had not yet finished cleaning his room in the basement and needed the recipient of the call to throw away the trash at the bottom of the stairs (which is where the Nike Air Force 1 shoes had been found).

[13]     In March, a man named Brandon Trotter contacted police and said that he had been at his sister's apartment in the early-morning hours of January 16 and had seen Davis-Martin there. According to Brandon, Davis-Martin was "geeked" and "[h]igh on cocaine, weed, [and] alcohol." Tr. Vol. III pp. 158, 161. Davis-Martin told the people gathered there that he had hit somebody "over the head" and the blood "squirted out like a movie." *Id.* at 158. Brandon noticed blood on Davis-Martin's shirt and in the webs between his fingers.

[14]     Also in March, police spoke with Cameron Wilson and Laura Luna, who were also at that same apartment in the early-morning hours of January 16. During their interviews with Cameron and Laura, police learned that between 2:00 and 3:00 a.m. on January 16, Laura drove Cameron to the apartment. Laura stayed in the car while Cameron went inside. When Cameron walked in, Davis-Martin, whom he knew from high school, was there. Davis-Martin asked Cameron for a ride to Sorin Street. Cameron agreed, and Davis-Martin accompanied him to the waiting car. Laura then drove to Sorin Street. On the way, Davis-Martin said "he got into it [earlier that night] with somebody because they made a pass on him" and "tried to suck his di**." *Id.* at 171. Davis-Martin referred to the person as a "fa**ot." *Id.* at 195. Davis-Martin said he stabbed the person "a couple times," threw him out of the house, and thought he had killed him. *Id.* at 195. Neither Cameron nor Laura believed Davis-Martin at the time.

[15]     When they were almost to Sorin Street, however, Davis-Martin called his mother and told her to get rid of a coat, boil some water and bleach and melt

the snow with blood in it, and clean the blood on the porch. Cameron said Davis-Martin did not use Cameron's phone to make the call and that he assumed Davis-Martin used Laura's phone. Laura, however, said she did not know what phone Davis-Martin used. In any event, when they pulled up across from the Sorin Street house, the car's headlights illuminated Jodie lying in the street in a curled-up position. He was barely moving. Upon seeing this, Davis-Martin exclaimed, "fu\*\*ing fa\*\*ot is still alive." *Id.* at 200. Davis-Martin got out of the car and started kicking and punching Jodie. Jodie, who did not fight back, grunted. Davis-Martin then retrieved a paver from a nearby retaining wall and was about to hit Jodie with it when Cameron got out of the car and stopped him. As Cameron and Laura pulled away from the house, Jodie's body was no longer curled up but rather face down—the same position he was in when police arrived shortly before 7 a.m. Numb and afraid, neither Cameron nor Laura called police.

[16] The State charged Davis-Martin with murder on March 22; he was still in the St. Joseph County Jail on the unrelated charge when he was served with the arrest warrant. Appellant's App. Vol. II p. 137.

[17] While incarcerated, Davis-Martin spoke to several inmates about his case. For example, Andrew Fry was housed with Davis-Martin for approximately six weeks beginning in June 2016. Davis-Martin and Andrew became friends, discussing the frequent jailhouse topics of "Women and sex, our cases and drugs, what we're in [jail] for," and "what is going on in the cell block." Tr. Vol. II pp. 223-24. During one of these conversations, Davis-Martin looked

"down" and "depressed." *Id.* at 224. To cheer him up, Andrew told him about one of his and his wife's "swinger encounters." *Id.* At the end of the story, Davis-Martin asked Andrew if he was attracted to any of the men that he and his wife had encounters with. Andrew responded yes, because he was bisexual. Davis-Martin responded that he was bisexual, too. Davis-Martin then asked Andrew if he had told anyone about being bisexual, and Andrew answered that his wife knows "and whoever I decide to let know." *Id.* at 225. Davis-Martin, however, said he did not want anyone to know and "that's why he was in jail." *Id.* at 226. Davis-Martin then explained that he and Jodie had a relationship and that everything was going well until Jodie wanted to tell people about their relationship. Davis-Martin said one night, Jodie went to the Sorin Street house looking for him and ended up telling his mother about their relationship. Davis-Martin's mother then called him inquiring about his relationship with Jodie. Davis-Martin was "furious" about this. *Id.* at 228. When Davis-Martin saw Jodie later, they argued, and Davis-Martin hit him with a gun. Davis-Martin planned to hit Jodie "only a few times," but "he couldn't stop himself" and beat him up "until he couldn't move no more." *Id.* at 229. Davis-Martin told Andrew that although the police did not have a lot of physical evidence implicating him, he was worried about "some shoes." *Id.* at 231.

[18] Davis-Martin also spoke with inmates Marcus Green and Anthony Lyons. Davis-Martin and Marcus were cellmates for a short time. According to Marcus, one day in September 2016 Davis-Martin told him that he was in jail for murder and that "all he did was beat the guy's ass and he froze to death."

Tr. Vol. III p. 149. Davis-Martin explained that the guy had told people they were having a relationship, which made him "look like a f\*\*." *Id.* at 150. In November 2016, Davis-Martin approached Anthony in the jail and said he heard that Anthony had beat a murder charge before and wanted to know his chances of doing the same. Anthony responded that he did not beat a murder charge; rather, he got convicted of a lesser charge. Davis-Martin then asked Anthony if he knew about his charge. When Anthony said no, Davis-Martin told him that he was in jail for "killing the f\*\*." *Id.* at 137. Anthony responded that their cases were not the same. Davis-Martin told Anthony that he still might be able to beat his murder charge because no one saw him kill Jodie.

[19] A jury trial was held in June 2017. At trial, Detective Cook testified on direct examination that when he eventually interviewed Davis-Martin in February 2016, Davis-Martin told him that he did not have a cell phone and had not had one for "quite some time." Tr. Vol. IV p. 17. Detective Cook, however, testified that this statement was not true, as he "received [Davis-Martin's] cellphone number during [his] investigation and actually did a search warrant, received his cellphone records . . . ." *Id.* Detective Cook explained that Davis-Martin's cell-phone records were "hit and miss" because with "[t]oday's technology you can actually make an internet call from your phone which is hard to track a number." *Id.* Detective Cook explained that despite Davis-Martin's claim that he did not have a cell phone, he could tell from Davis-Martin's cell-phone records that he, in fact, had a cell phone around the time of Jodie's murder. On cross-examination, defense counsel asked Detective Cook

if he had Davis-Martin's cell-phone records with him, and Detective Cook responded that he only had his "notes" and "work product" with him. *Id.* at 20. Defense counsel then asked Detective Martin if there were any calls between Davis-Martin's cell phone and Felisha's cell phone between 10 p.m. on January 15 and the following day when Felisha called Davis-Martin from the police station, and Detective Cook said no. *Id.* at 22. Defense counsel also asked Detective Cook if there were any calls between Laura's cell phone and Felisha's cell phone around that same time, and Detective Cook said no. *Id.* at 23, 36, 37-38. Detective Cook reiterated that internet calls cannot be tracked, which is one of law enforcement's "biggest enemies" right now. *Id.* at 36; *see also id.* at 38 (explaining that the internet "makes phone calls disappear").

[20] Defense counsel also cross-examined Detective Cook about whether Marcus and Anthony had given him information in the past:

> Q     Has Marcus Green provided you information on any other cases; either a defendant who is already charged or a case that you are investigating and he provides information that would assist in that?
>
> A     Not that I recall.
>
>                            * * * * *
>
> Q     What about Anthony Lyons?
>
> A     Possibility. He has been around a while.

> Q    Did you investigate a case against Brian Lac[e]y?
>
> A    Bryant Lac[e]y, yes, ma'am.
>
> Q    Bryant Lac[e]y?
>
> A    Yes.
>
> Q    And did [Anthony] Lyons give you information on that case?
>
> A    Not that I recall.

Tr. Vol. IV p. 31.  Defense counsel then moved on to a different topic.

In addition, Cameron testified on direct examination that while they were driving to Sorin Street, Davis-Martin said he beat somebody up because they made a pass at him and "tried to suck his di\*\*." Tr. Vol. III p. 171. The following colloquy then occurred:

> Q    Now, previously you talked to the police about this, right?
>
> A    Yeah.
>
> Q    And you told them some additional details about a couple of those things?
>
> A    I told you before I don't remember. It's been so long, and I was drunk that night too.

Q     Did you tell the police that [Davis-Martin] told you that he killed a fa\*\*ot that night?

A     No.

Q     Did you tell the police that [Davis-Martin] had told you that he stabbed the guy in the head multiple times?

A     No.

Q     Did you tell the police that he had thrown the guy out of his house and beat his a\*\*?

A     No.

Q     Are you saying he didn't say those things?

A     I don't recall.

Q     You don't remember saying those things?

A     I don't remember.  I told you I was drunk.

Q     And if you told police about this conversation just a couple months after it happened, would your memory have been better when you talked to the police then or would your memory be better now?

A     Pretty sure it would be better than it is now.

Q     So you could have said those things, you just aren't sure that you said them as we sit here today?

A     Right.

*Id.* at 172-73. Cameron went on to testify that as they pulled up across from the Sorin Street house, they saw Jodie, who looked beat up, lying in the street. Davis-Martin then got out of the car and hit, kicked, and punched Jodie while calling him a "fa*." *Id.* at 177. Cameron testified that Davis-Martin got a paver and was about to hit Jodie with it when he got out of the car and stopped Davis-Martin from doing so.

[22]     At the close of the evidence, the trial court gave the jury the following pattern jury instruction on impeachment by prior inconsistent statements:

> The credibility of a witness may be attacked by introducing evidence that on some former occasion the witness made a statement inconsistent with his testimony in this case. Evidence of this kind may be considered by you in deciding the value of the testimony of the witness.

2 Ind. Pattern Jury Instruction—Criminal § 12.1300 (4th ed.); Appellant's App. Vol. II p. 121. Davis-Martin asked the trial court to add the following sentence to the end of the pattern instruction, "However, prior inconsistent statements of a testifying witness that were offered for impeachment may not be considered as substantive evidence." Appellant's App. Vol. II p. 67. The trial court declined to add the sentence, finding that its instruction was "the pattern and it says most everything you said." Tr. Vol. IV p. 95.

[23]     The jury found Davis-Martin guilty. At sentencing, the trial court found no mitigators and the following aggravators: (1) Davis-Martin's criminal history

(Class A misdemeanor intimidation and Class C felony carrying a handgun without a license); (2) the fact that he was on probation for the handgun conviction when he committed the offense; and (3) the nature and circumstances of the offense. The trial court explained that the third aggravator was the "biggest":

> I think the most aggravating part of this case or biggest aggravating factor that I consider would be the fact – I guess we can call it the nature and circumstances of the offense. We can call it the fact that the harm inflicted was greater than what was necessary for the commission of the offense itself, but I guess when I look at it, Mr. Davis-Martin, it was the absolute depravity with which this crime was committed.[1] I struggle to think of another case that I have seen . . . that exhibited this level of depravity, and that's really the only word I can think to use that in my mind encompasses what happened to [Jodie].
>
> I look at the fact that this was a person that you knew, that you were purportedly friends with, family were friends, someone that you hung out with . . . fairly regularly. Whether or not the two of you were in a relationship, whether you weren't—there is evidence to suggest either or both.
>
> You knew [Jodie]. You knew who he was. You knew that he was a veteran. You knew that he was a gay man. You knew if

---

[1] Davis-Martin argues that the trial court erred in identifying the third aggravator. He claims that this aggravator is labeled "the harm inflicted was greater than what was necessary to commit the offense," which is improper as a matter of law because death (the harm inflicted) is an element of murder. Appellant's Br. p. 35. The trial court, however, gave two labels for this aggravator. Regardless of the label, the court made clear that this aggravator was the depraved nature and circumstances of the offense. Tr. Vol. IV p. 174. As the court put it, at any point Davis-Martin could have called for help, but he did not do so; instead, he went back to the Sorin Street house, not to help Jodie, but "to insure that [he] was dead." *Id.* at 176. The trial court did not err in identifying the third aggravator.

from nothing else from the evidence presented that night that . . . he had expressed interest in you and having more than a friendship with you. So you knew all of those things about him. But up to that point as far as I could tell those things didn't impact your friendship in any way. They didn't diminish the friendship. It didn't make him a lesser person in your mind.

But something that night, Mr. Davis-Martin. Again I keep going back to the fact that it's this level of depravity that I just haven't seen in many cases before now.

And . . . what it reveals to me is your character. And I can consider your character in fashioning a sentence as well. And what you put [Jodie] through that night was so far greater than what would have been necessary to satisfy the elements of murder. . . . The length of time over which this killing occurred, the fact that at some point during the attack that you perpetrated you could have called for help, you could have realized what you were doing, realized the situation [Jodie] was in, gotten him help, kept him alive. And you didn't. And what you did do was go back to insure that he was dead. And that to me just speaks to your character, Mr. Davis-Martin.

And I can't fathom – we talk about the worst of the worst offenders being deserving of the maximum sentence, I can't fathom a wors[e] offense and I can't fathom a wors[e] offender and a wors[e] character based upon the nature and circumstances of this situation.

*Id.* at 174-76. Accordingly, the court sentenced Davis-Martin to the maximum term of sixty-five years.

[24] After sentencing, the State turned over Davis-Martin's cell-phone records to the defense. Appellant's App. Vol. II p. 170. Davis-Martin then filed a motion to

correct error, arguing that the State (1) withheld his cell-phone records in violation of *Brady* and (2) knowingly used false evidence from Detective Cook regarding whether Marcus and Anthony had given him information in the past without correcting it. To support his motion, Davis-Martin submitted several exhibits, including the following: (1) his cell-phone records and (2) police reports that the State had provided him in discovery showing that Marcus and Anthony had given Detective Cook information in the Bryant Lacey murder case. The State filed a response along with affidavits. According to Detective Cook's affidavit, after trial he found Davis-Martin's cell-phone records

> in a folder on my computer's hard drive labeled, "Felisha Sconiers Records." In checking the CMHU hard drive, the master evidence log, and the master casebook, it does not appear that I turned in the Defendant's records to our evidence technician. The evidence technician is the party that sends out copies of our materials to the prosecutor.

Appellant's App. Vol III. p. 126. Detective Cook's affidavit also provided:

> [A]t that moment on the witness stand, I did not recall that [Marcus] and [Anthony] gave information on the Lacey case. My testimony was honest. I would not, and did not[,] misrepresent information or lie.

*Id.* The trial court denied Davis-Martin's motion to correct error.

[25] Davis-Martin now appeals.

# Discussion and Decision

## I. Motion to Correct Error

Davis-Martin first contends that the trial court should have granted his motion to correct error. Generally, rulings on motions to correct error are reviewed for an abuse of discretion. *Becker v. State*, 992 N.E.2d 697, 700 (Ind. 2013).

### A. Late disclosure of Davis-Martin's cell-phone records

Davis-Martin argues that the State violated *Brady* "by failing to disclose Davis-Martin's cellular phone records which were material." Appellant's Br. p. 18. *Brady* and its progeny apply to the State's failure to disclose favorable evidence that is material to the accused's guilt or punishment. *Cone v. Bell*, 556 U.S. 449, 469 (2009); *Brady*, 373 U.S. at 87. There are three components to a *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice (materiality inquiry). *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence is material when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Cone*, 556 U.S. at 470. Notably, *Brady* only applies to the discovery, **after trial**, of information that was known to the prosecution but unknown to the defense. *Hubbell v. State*, 754 N.E.2d 884, 893 (Ind. 2001); *Lowrimore v. State*, 728 N.E.2d 860, 867 (Ind. 2000), *reh'g denied*; *Bates v. State*, 77 N.E.3d 1223,

1226 (Ind. Ct. App. 2017); *see also* 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.3(b) (4th ed. 2015).

[28] We recently addressed the State's late disclosure of evidence in *Bates*. In that case, the defendant was charged with burglary for breaking into a house and taking a diaper bag. While combing the victim's neighborhood for the diaper bag, the police found a wallet. The police contacted the wallet's owner, who said that he had lost his wallet over two years earlier. The police determined that the wallet was unrelated to the burglary case and did not tell the defendant about its discovery. At trial, one of the searching officers briefly testified that another officer had found a wallet during the search. Defense counsel cross-examined the officer about the wallet but did not ask for a continuance to pursue the matter. After the State's case-in-chief, the defendant argued that the State's failure to disclose the existence of the wallet before trial violated *Brady*. The trial court found no *Brady* violation, and the jury eventually found him guilty of burglary.

[29] The defendant renewed his *Brady* challenge on appeal. We explained that for most exculpatory evidence, the prosecution is able to satisfy its constitutional obligation by disclosing the evidence at trial. *Bates*, 77 N.E.3d at 1226 (citing 6 LaFave, § 24.3(b)). In such cases, the burden rests with the defendant to establish that "the lateness of the disclosure so prejudiced defendant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial." *Id.* (quoting 6 LaFave, § 24.3(b)). We noted that if the defendant does not request a continuance when the

disclosure is first made at trial, that failure may be viewed as negating any claim of actual prejudice. *Id.* (citing 6 LaFave, § 24.3(b)); *see also Braswell v. State*, 550 N.E.2d 1280, 1283 (Ind. 1990) (explaining that a continuance could have been a proper remedy when the evidence was disclosed during—and not before—trial; however, the defendant did not request a continuance). We ultimately concluded that the defendant's *Brady* challenge failed for two reasons: (1) he gave us "no reason to believe that the owner could have offered evidence that was favorable to him, either because it was exculpatory or impeaching" and (2) he "did not ask the trial court for a continuance to pursue the matter." *Bates*, 77 N.E.3d at 1226.

[30]     This case is similar to *Bates*. At trial, Detective Cook testified that he had obtained Davis-Martin's cell-phone records.[2] On cross-examination, defense counsel asked Detective Cook if he had Davis-Martin's cell-phone records with him, and Detective Cook said no. Defense counsel then asked Detective Cook about those records, including whether they showed a phone call from Davis-Martin to his mother around 2:00 to 3:00 a.m. on January 16 (which is when Cameron and Laura testified that Davis-Martin called his mother from the car). Detective Cook said the records did not disclose such a call but that did not

---

[2] It appears that defense counsel knew the State was attempting to get Davis-Martin's cell-phone records before trial. In February 2017, about four months before trial, defense counsel sent the following email to the prosecutor:

> I have a subpoena for [Davis-Martin's] phone records but no disc that indicates that's what is on it nor have I found it on another disc.

Appellant's App. Vol. III p. 59.

mean such a call did not occur. He explained that if someone makes a call from their cell phone using the internet, such as by using Facebook Messenger, that call will not show up on cell-phone records. Defense counsel also asked Detective Cook about Laura's cell-phone records. Again, Detective Cook said they did not disclose a call to Felisha around 2:00 to 3:00 a.m. on January 16. He added the same caveat about calls not showing up if they are made using the internet. Davis-Martin did not object or ask for a continuance to further explore issues relating to his cell-phone records.

[31] We find that Davis-Martin's *Brady* challenge fails for two reasons. First, Davis-Martin's failure to request a continuance negates any claim of actual prejudice. A request for a continuance would have allowed the trial court and the parties to discuss this issue in real time—and not in a motion to correct error after trial. Second, Davis-Martin has failed to prove that the State's late disclosure so prejudiced his preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial. Davis-Martin claims that his cell-phone records—which do not show a call from his cell phone to his mother's cell phone around 2 to 3 a.m. on January 16—would have "dispel[led]" Cameron's and Laura's testimony that he called his mother from the car and asked her to destroy evidence. Appellant's Br. p. 18. But defense counsel was able to make this point during her cross-examination of Detective Cook. And defense counsel argued the point during closing argument. *See* Tr. Vol. IV p. 126 (arguing that after 10 p.m. on January 15, there were no calls between Davis-Martin and his mother until she called him on January 16 from

the police station). Notably, Davis-Martin does not cite any additional information from his cell-phone records that he would have used. In any event, Detective Cook testified that even if the cell-phone records did not contain such a call, a call still could have been made using the internet. Accordingly, the trial court did not abuse its discretion in denying Davis-Martin's motion to correct error on this ground.[3]

## B. Failure to correct false evidence

[32] Davis-Martin next argues that his "due process rights under the Fourteenth Amendment of the U.S. Constitution were violated when the State's witness, Detective Cook, testified falsely and the State failed to correct it." Appellant's Br. p. 19. Davis-Martin points out that contrary to Detective Cook's responses of "Not that I recall," Marcus and Anthony had, in fact, provided him with information in the Bryant Lacey murder case.

[33] It is well established that "a conviction obtained through use of false evidence, known to be such by representatives of the State, [falls] under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*,

---

[3] Davis-Martin also argues that he could have used his cell-phone records "to impeach [Detective] Cook's assertion that Davis-Martin got rid of his phone to conceal evidence of his involvement in [Jodie's] death." Appellant's Br. p. 18. Davis-Martin, however, does not cite the record to support that Detective Cook made such an assertion.

360 U.S. 264, 269 (1959) (citations omitted); *see also Smith v. State*, 34 N.E.3d 1211, 1219 (Ind. 2015). As our Supreme Court has said,

> In determining whether to vacate a conviction because of the State's solicitation of false evidence or knowing use of it without correction, . . . the proper question is: did the State impermissibly use false testimony to obtain a conviction in violation of a defendant's due process rights? The main thrust of the case law in this area focuses on whether the jury's ability to assess all of the facts and the credibility of the witnesses supplying those facts has been impeded to the unfair disadvantage of the defendant. Active or passive behavior by the State that hinders the jury's ability to effectively act as the fact-finder is impermissible and may violate a defendant's due process rights.

*Smith*, 34 N.E.3d at 1220.

[34] Davis-Martin claims that he "should have been given the opportunity" to argue to the jury that Marcus and Anthony were serial snitches. Appellant's Br. p. 22. But Davis-Martin had an opportunity to do just that. As the State points out, during discovery it provided Davis-Martin with Detective Cook's police reports in Bryant Lacey's murder case showing that Marcus and Anthony had, in fact, given Detective Cook information. Appellant's App. Vol. III pp. 34-40, 117; Appellee's Br. p. 35. If Davis-Martin was not satisfied with Detective Cook's "Not that I recall" responses, then he should have asked him about the police reports. Davis-Martin did not do so. Accordingly, the trial court did not abuse its discretion in denying Davis-Martin's motion to correct error on this ground either.

# II. Pattern Jury Instruction

[35]   Davis-Martin next contends that the trial court erred in not supplementing Pattern Jury Instruction—Criminal 12.1300 with the following sentence, "However, prior inconsistent statements of a testifying witness that were offered for impeachment may not be considered as substantive evidence." Davis-Martin claims that this sentence was needed because of the State's direct examination of Cameron regarding whether he gave additional details to the police.

[36]   The purpose of jury instructions is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. *O'Connell v. State*, 970 N.E.2d 168, 172 (Ind. Ct. App. 2012). Instructing the jury lies within the sole discretion of the trial court. *McBride v. State*, 785 N.E.2d 312, 316 (Ind. Ct. App. 2003), *trans. denied*. Before a defendant is entitled to reversal, he must affirmatively show that the instruction error prejudiced his substantial rights. *Hernandez v. State*, 45 N.E.3d 373, 376 (Ind. 2015).

[37]   We emphasize that the instruction the trial court gave is a pattern jury instruction. The instruction advised the jury that a witness's credibility may be attacked with a prior inconsistent statement and that the prior inconsistent statement may be considered by the jury in deciding the value of the witness's trial testimony. The pattern jury instruction fully informed the jury of the law. But even if we agreed with Davis-Martin that the trial court should have

supplemented the pattern jury instruction, he has not shown that the instruction error prejudiced his substantial rights. Although the State may impeach its own witness, it may not put a witness on the stand for the sole purpose of introducing otherwise inadmissible evidence cloaked as impeachment. *Herron v. State*, 10 N.E.3d 552, 556 (Ind. Ct. App. 2014). On direct examination, the State asked Cameron three questions regarding whether he gave additional details to the police: (1) whether he told police that Davis-Martin told him that he "killed a fa**ot that night"; (2) whether he told police that Davis-Martin told him that he stabbed Jodie in the head multiple times; and (3) whether he told police that Davis-Martin had thrown Jodie "out of his house and beat his a**." Tr. Vol. III p. 172. Cameron said he did not remember making those statements, but he could have. This, however, was not the State's sole—or even primary—purpose for calling Cameron as a witness. Cameron also testified that Davis-Martin attacked Jodie because he made a move on him, that he saw Davis-Martin hit, kick, and punch Jodie while calling him a "fa*," and that he stopped Davis-Martin from hitting Jodie with a paver. *Cf. Herron*, 10 N.E.3d at 556 (concluding that the State's only purpose in calling a witness to the stand was for impeachment, as the impeachment spanned thirty of thirty-five pages of the witness's testimony, with the remaining pages containing no substantive testimony). Accordingly, Davis-Martin has failed to establish reversible error on this issue.

# III. Privilege Against Self-Incrimination

[38] At trial, the State presented evidence that Felisha, at the request of Detective Cook, called Davis-Martin from the police station on January 16 and told him that the police wanted him (as well as everyone else at the Sorin Street house that night) to come to the station to discuss Jodie's death, but Davis-Martin told his mother that he was not going to the police station because he was at work. Davis-Martin did not object to this testimony. Davis-Martin now argues that the trial court should not have allowed the State to present this evidence because it violated his Fifth Amendment privilege against self-incrimination. Davis-Martin acknowledges that because he did not object below, he must establish fundamental error. The doctrine of fundamental error is an extremely narrow exception to the waiver rule that requires the defendant to show that the alleged error was so prejudicial to the defendant's rights as to make a fair trial impossible. *Gavin v. State*, 41 N.E.3d 1038, 1042 (Ind. Ct. App. 2015). The defendant must show that, under the circumstances, the trial judge erred in not raising the issue sua sponte because the alleged error (a) constituted a clearly blatant violation of basic and elementary principles of due process and (b) presented an undeniable and substantial potential for harm. *Id.*

[39] The Fifth Amendment to the U.S. Constitution, made applicable to the states through the Fourteenth Amendment, provides that no person shall be compelled in any criminal case to be a witness against himself. U.S. Const. amend. V; *Cameron v. State,* 22 N.E.3d 588, 592 (Ind. Ct. App. 2014). "[A] witness who desires the protection of the privilege must claim it at the time he

relies on it." *Salinas v. Texas*, 570 U.S. 178, 183 (2013) (plurality opinion) (quotation and ellipsis omitted); *Nichols v. State*, 55 N.E.3d 854, 860 (Ind. Ct. App. 2016), *trans. denied*. "[N]o ritualistic formula is necessary in order to invoke the privilege" against self-incrimination. *Quinn v. United States*, 349 U.S. 155, 164 (1955). Rather, the witness must only put the interrogating official "on notice [that he] intends to rely on the privilege." *Salinas*, 570 U.S. at 183; *see also Quinn*, 349 U.S. at 164 (holding that the witness's invocation must be "sufficiently definite to apprise [the interrogating official] of his intention" to invoke the privilege). The express invocation requirement gives courts tasked with evaluating a Fifth Amendment claim a contemporaneous record establishing the witness's reasons for refusing to answer. *Salinas*, 570 U.S. at 183-84.

[40] Here, we find that Davis-Martin did not invoke the privilege against self-incrimination when he told his mother on the phone that he was not going to the police station to talk to the police. *See id.* at 185-91 (a plurality opinion holding that a witness does not invoke the privilege against self-incrimination by simply standing mute and that the prosecution's use of the defendant's noncustodial silence did not violate the Fifth Amendment because the defendant failed to state that he was not answering the officer's question on Fifth Amendment grounds); *Nichols*, 55 N.E.3d at 860 (holding that evidence that the defendant did not accept a police officer's invitation to attend an interview did not violate the defendant's Fifth Amendment privilege against self-incrimination because the defendant did not invoke the privilege); *Owens v.*

*State*, 937 N.E.2d 880, 891-92 (Ind. Ct. App. 2010) (concluding that even under cases holding that a defendant's pre-arrest, pre-*Miranda* silence is protected by the Fifth Amendment, evidence that the defendant did not respond to a police officer's efforts to make contact with him did not support a finding that he invoked his right to remain silent), *reh'g denied*, *trans. denied*; *see also Mira v. State,* 3 N.E.3d 985, 986-89 (Ind. Ct. App. 2013) (in a case where a detective wrote a letter to the defendant that he was a suspect in a larceny and needed to contact him, the defendant called the detective and told him that he would check his schedule and call back, but the defendant never called back, we held that the failure on the defendant's part to follow up with the detective comported with *Owens* and "d[id] not support a finding that he invoked his right to remain silent" under Article 1, Section 14 of the Indiana Constitution).

[41] There could have been many reasons why Davis-Martin did not want to talk to the police that day. *See, e.g., Salinas*, 570 U.S. at 189 ("To be sure, someone might decline to answer a police officer's question in reliance on his constitutional privilege. But he also might do so because he is trying to think of a good lie, because he is embarrassed, or because he is protecting someone else."); *Owens*, 937 N.E.2d at 891 ("Owens's mere lack of response does not support a finding that he invoked the right to remain silent. Perhaps Owens did not respond because the wind blew [the police officer's business] cards away, or perhaps Owens was very ill or too busy, or perhaps he just did not like the police."). In fact, Davis-Martin told his mother on the phone that he could not go to the police station because he was working. Notably, Davis-Martin later

spoke to Detective Cook. Accordingly, we conclude that the State did not violate Davis-Martin's Fifth Amendment privilege against self-incrimination. It follows that no error, let alone fundamental error, occurred in the admission of this evidence.

# IV. Sufficiency of the Evidence

[42] Davis-Martin contends that the evidence is insufficient to support his conviction for murder. When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016). It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* It is not necessary that the evidence "overcome every reasonable hypothesis of innocence." *Id.* (quotation omitted). The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007).

[43] Davis-Martin's sufficiency challenge is a narrow one. That is, he argues that "there was insufficient evidence of a credible nature from which a reasonable jury could have found him guilty beyond a reasonable doubt." Appellant's Br. p. 29. Davis-Martin points out that the State's witnesses included felons, jailhouse snitches, and reluctant witnesses. He also points to contradictions in some of the witnesses' testimony. However, all of these things were pointed out to the jury during trial, and the jury found him guilty of murder. The jury, and

jury alone, assesses the credibility of witnesses and resolves conflicts in the evidence. Moreover, in making his sufficiency challenge, Davis-Martin does not acknowledge the other evidence admitted in this case—including physical evidence. Accordingly, Davis-Martin's sufficiency challenge fails.

# IV. Sentencing

[44] Last, Davis-Martin contends that the trial court erred in sentencing him to the maximum term of sixty-five years. Our trial courts enjoy broad discretion in sentencing, and we will reverse only for an abuse of that discretion. *McCoy v. State*, 96 N.E.3d 95, 99 (Ind. Ct. App. 2018). One way a trial court abuses its discretion is entering a sentencing statement that "omits reasons that are clearly supported by the record and advanced for consideration." *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007).

[45] Davis-Martin first argues that the trial court should have considered his age— he was twenty-three at the time of Jodie's murder—as a mitigator. *See* Tr. Vol. IV p. 169 (defense counsel asking the trial court to impose the advisory sentence of fifty-five years "given Mr. Davis-Martin's age, balanced against what stated I about his [criminal] record."). Youth, however, is not automatically a significant mitigating circumstance. *Smith v. State*, 872 N.E.2d 169, 178 (Ind. Ct. App. 2007), *trans. denied*. If a trial court does not find youth to be a mitigator, it is under no obligation to explain its reasoning. *Id.* At the time of the Jodie's murder, Davis-Martin had two convictions and was on probation for a handgun conviction. He also had a juvenile record, including a period of

probation. In light of this evidence, the trial court did not abuse its discretion in not identifying Davis-Martin's age as a mitigator.

[46] Davis-Martin next argues that the trial court should have considered as a mitigator that he "had a young baby that he cared for prior to his incarceration" and that long-term incarceration would create an undue hardship to his child. Appellant's Br. p. 34. Davis-Martin, however, did not advance this mitigator below, and on appeal he does not cite any evidence in the record that he cared for his child before Jodie's murder. In fact, the PSI suggests that Davis-Martin had little involvement with his child. *See* Appellant's App. Vol. II p. 142 ("The defendant reported the child lives with [her mother] and the defendant reported he is unsure of his relationship with the child. . . . The defendant reported he has not been ordered to pay child support . . . ."). Accordingly, the trial court did not abuse its discretion in not finding undue hardship to his child as a mitigator.

[47] Last, Davis-Martin argues that the trial court should have considered as a mitigator that this act "was out of character for [him]," as there was evidence that he and Jodie had "a good and playful relationship" before this night. Appellant's Br. p. 34. However, any positive character evidence is overshadowed by Davis-Martin's actions in beating Jodie and leaving him in the cold, only to return to beat him some more. The trial court did not abuse its discretion in not finding Davis-Martin's character as a mitigator. We therefore affirm Davis-Martin's sixty-five-year sentence.

Affirmed.

Riley, J., and Kirsch, J., concur.