## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 29 2019, 10:12 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Brenton E. Barnhill,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 29, 2019

Court of Appeals Case No.
18A-CR-2852

Appeal from the Vigo Superior Court

The Honorable Sarah K. Mullican, Judge

Trial Court Cause No.
84D03-1804-F3-1061

**Friedlander, Senior Judge.**

[1] Brenton E. Barnhill appeals his convictions of rape, a Level 3 felony;[1] criminal confinement resulting in bodily injury, a Level 5 felony;[2] domestic battery in the presence of a child under the age of sixteen, a Level 6 felony;[3] and strangulation, a Level 6 felony.[4] We affirm.

[2] Barnhill and the victim, H.P., knew each other from childhood. H.P. had married another man and had two children, but after her relationship with her children's father ended, H.P. began a romantic relationship with Barnhill. H.P. and Barnhill had a child together. At the times relevant to this case, all three children were well under the age of sixteen.

[3] H.P. and her children lived in an apartment. Beginning in December 2017, Barnhill stayed at the apartment four to five nights a week, sleeping in H.P.'s bed. He watched the children while she was at work. During this period, Barnhill choked and struck H.P. on several occasions. After he struck her, Barnhill would sometimes force H.P. to engage in sexual behavior.

[4] On March 14, 2018, H.P. returned home from work between 11:10 and 11:20 p.m. The children were in their bedrooms, asleep. She ate dinner and went to sleep. Barnhill was in bed with H.P., but he stayed awake and watched

---

[1] Ind. Code § 35-42-4-1 (2014).

[2] Ind. Code § 35-42-3-3 (2014).

[3] Ind. Code § 35-42-2-1.3 (2016).

[4] Ind. Code § 35-42-2-9 (2014).

television. H.P. woke up around 1 a.m., thinking about whether Barnhill was seeing other women. She went to the bathroom, and when she returned, she told him "that he had lied to me." Tr. Vol. III, p. 76.

[5] In response, Barnhill jumped out of bed, asked H.P. "what the f**k am I lying about," and grabbed her by the hair. *Id.* at 77. Next, he "slammed" her onto the bed and climbed on top of her. *Id.* Barnhill used his legs to pin down H.P.'s arms. He grabbed her throat with his left hand and began "punching [her] in the face like [she] was a man." *Id.*

[6] H.P. begged him to stop and repeatedly said she could not breathe. Barnhill responded that she "should just go ahead and stop breathing then." *Id.* She freed her arms and slapped and shoved him, to no effect. Next, H.P. called for help, but Barnhill "got even more mad" and put his hand over her mouth. *Id.* at 78. She bit Barnhill's thumb, but he did not stop hitting her.

[7] Barnhill became tired after five to ten minutes. He climbed off of her and laid down on the bed. H.P. continued to lay on the bed, crying. After another five to ten minutes elapsed, Barnhill took off his clothes and forced H.P. to have sex as she continued to cry.

[8] Next, H.P. went to the bathroom. When she looked in the mirror, she saw that her eyes were black and blue, her mouth and jaw were swollen, and she had bruises on her face, neck, and chest. H.P. showed her injuries to Barnhill, and he told her she should call in sick to work "because he didn't want no one [sic]

to see my face like that." *Id.* at 84. She returned to bed. Barnhill put his arms around her, and H.P. cried until she fell asleep.

[9] Barnhill was gone when H.P. woke up the next morning. H.P.'s aunt and her mother arrived at the apartment several hours later. Upon seeing H.P.'s injuries, H.P.'s mother called 911, over H.P.'s objection. Two officers were dispatched to investigate.

[10] As the officers talked with H.P., they noted that H.P. had two black eyes, and one of her eyes was bloodshot. In addition, her lips and jaw were swollen, and she had bruises on her face, neck, chest, and right arm. H.P. stated she had a headache and had trouble swallowing. She initially wanted to protect Barnhill and told the officers that she had "gotten jumped after work" by two women. *Id.* at 94. H.P. soon admitted to the officers that her boyfriend had beaten her. H.P.'s aunt gave the officers Barnhill's name.

[11] Next, H.P.'s mother took her to the hospital, where a nurse practitioner (NP) interviewed and treated H.P. H.P. initially repeated her story that a woman had injured her, but she later admitted to the NP that her boyfriend had attacked her. The NP noted H.P. had bruises on her face, neck, and upper chest, and H.P. reported having a headache. The NP further concluded H.P.'s injuries were consistent with being beaten. Specifically, the bruising around her eyes was consistent with being strangled. After hospital staff released H.P., she spent the night in a hotel with her children and her mother.

[12] When H.P. and her children returned to her apartment, Barnhill was there. H.P. contacted her aunt, who called the police. When the police arrived, Barnhill fled out the apartment's back door. He was later arrested.

[13] On March 21, 2018, H.P. met with Bryanna Wynn, an investigator for the prosecutor's office. Wynn specializes in cases involving domestic violence. During their conversation, H.P. disclosed facts that led Wynn to believe Barnhill had sexually assaulted H.P.

[14] The State charged Barnhill with rape, a Level 3 felony; criminal confinement resulting in bodily injury, a Level 5 felony; domestic battery in the presence of a child under the age of sixteen, a Level 6 felony; strangulation, a Level 6 felony; domestic battery resulting in moderate bodily injury, a Level 6 felony; and domestic battery, a Class A misdemeanor. The State further alleged that Barnhill was an habitual offender.

[15] A jury trial was held on June 19 through 21, 2018. The jury determined Barnhill was guilty as charged of the felonies and the misdemeanor. Next, Barnhill admitted he was an habitual offender, eliminating the need for a separate trial on that issue. The court entered a judgment of conviction on the jury's verdict and the habitual offender enhancement.

[16] On September 4, 2018, the day of the sentencing hearing, Barnhill filed a motion to correct error and/or set aside the verdict. He alleged the State had withheld exculpatory evidence related to discussions between H.P. and Wynn. At the sentencing hearing, the trial court heard evidence related to sentencing

and to Barnhill's motion to correct error. The trial court vacated the convictions of domestic battery resulting in moderate bodily injury, a Level 6 felony, and Class A misdemeanor domestic battery. The court then imposed a sentence. Next, the parties filed briefs addressing Barnhill's motion to correct error. Ultimately, the trial court denied Barnhill's motion, and this appeal followed.

[17] Barnhill raises two claims, which we restate as:

> 1. Whether the trial court erred in rejecting Barnhill's claim that the State had withheld exculpatory evidence, in violation of *Brady v. Maryland*.
>
> 2. Whether Barnhill's convictions violate Indiana's constitutional protection against double jeopardy.

## 1. *Brady v. Maryland*

[18] Barnhill argues the trial court should have granted his motion to correct error and set aside the judgment of conviction because the State withheld exculpatory evidence, in violation of his federal and state constitutional right to due process of law. Generally, rulings on motions to correct error are reviewed for an abuse of discretion. *Davis-Martin v. State*, 116 N.E.3d 1178 (Ind. Ct. App. 2019), *trans. denied*. Where, as here, an appellant raises a constitutional question, our standard of review is de novo. *Tiplick v. State*, 43 N.E.3d 1259 (Ind. 2015).

[19] In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963), the United States Supreme Court determined: "the suppression by the

prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The principle behind the Court's ruling is "avoidance of an unfair trial to the accused." *Id.* at 87, 83 S. Ct. at 1197.

[20] There are three components to a *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching of the State's witnesses; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the absence of the evidence prejudiced the accused (materiality inquiry). *Davis-Martin*, 116 N.E.3d 1178. Evidence is material when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Bates v. State*, 77 N.E.3d 1223 (Ind. Ct. App. 2017). The State will not be found to have suppressed material information if that information was available to a defendant through the exercise of reasonable diligence. *Conner v. State*, 711 N.E.2d 1238 (Ind. 1999).

[21] In Barnhill's case, prior to trial H.P. met several times with Wynn. In cases involving domestic violence, Wynn routinely refers victims to agencies that provide housing, food, utility assistance, and resources for children. Wynn and H.P. testified during the sentencing hearing that they had discussed whether she could go to a domestic violence shelter. They may have discussed other assistance programs as well but did not remember any details.

[22] Barnhill argues that the State should have disclosed to him that Wynn and H.P. had discussed a domestic violence shelter and possibly other assistance programs prior to trial because: (1) H.P. apparently believed such assistance was coming from and/or through the prosecutor's office; and (2) evidence of those discussions were relevant to impeach H.P. because the evidence could have established that H.P. had a bias in favor of the State or a motive to lie on the witness stand.

[23] We disagree with Barnhill for two reasons. First, the evidence of Wynn and H.P.'s discussions was not material for purposes of the *Brady* standard. Wynn testified without contradiction that neither she nor the prosecutor's office had any control over the shelter or any other agencies, and Wynn and the prosecutor did not ask anything from H.P. in exchange for the information about the assistance programs. In addition, H.P. testified that she and Wynn had discussed only one program that would have required specific conduct on her part (a college assistance program, administered by an agency other than the prosecutor's office, that would have required H.P. to stay away from Barnhill for one year), but they did not discuss that program until after Barnhill's trial was over. Under these circumstances, the impeachment value of these discussions is minimal at best, and we cannot conclude that there is a reasonable probability that being presented with evidence about the discussions would have changed the jury's verdict.

[24] Second, even if Wynn and H.P.'s discussions about assistance programs were material evidence, Barnhill could have discovered the evidence himself prior to

trial through the exercise of reasonable diligence. Barnhill took H.P.'s deposition on June 7, 2018, a few weeks prior to trial. During the deposition, Barnhill had ample opportunity to ask H.P. whether the prosecutor had promised anything in exchange for her testimony or whether H.P. believed she was required to testify favorably to the State. *See, e.g.*, *Hayden v. State*, 830 N.E.2d 923 (Ind. Ct. App. 2005) (Hayden failed to prove a *Brady* violation involving a witness's filing of a civil complaint; Hayden could have learned about the civil complaint during pretrial depositions), *trans. denied*.

[25] Next, Barnhill notes that after the trial was over, Wynn and H.P. discussed the college assistance program, which was administered by another agency. H.P. mistakenly believed the funds were coming from the prosecutor's office, posting on a social media account that "the Prosecutor's Office" was going to pay for her college. Tr. Vol. IV, p. 132. H.P.'s mistaken belief that the prosecutor had offered her money for college had no impact on her testimony or the jury's verdict because the discussion happened post-trial. As a result, the discussion was not material evidence, and the State did not violate *Brady* by failing to disclose it. The trial court did not err in denying Barnhill's motion to correct error.

## 2. Indiana Double Jeopardy Clause

[26] Barnhill argues his convictions of criminal confinement resulting in bodily injury, domestic battery in the presence of a child under the age of sixteen, and

strangulation violate the Indiana Constitution's prohibition of double jeopardy.[5] Specifically, he claims: (1) the confinement and domestic battery convictions violate double jeopardy; and/or (2) the confinement and strangulation convictions violate double jeopardy. He concedes the battery and strangulation convictions do not raise a double jeopardy issue. As noted above, we review constitutional claims de novo.

[27] Article 1, section 14 of the Indiana Constitution provides, in relevant part: "No person shall be put in jeopardy twice for the same offense." Prohibitions against double jeopardy protect the integrity of jury acquittals and the finality interest of defendants, shield against excessive and oppressive prosecutions, and ensure that defendants will not undergo the anxiety and expense of repeated prosecution and the increased probability of conviction upon reprosecution. *Richardson v. State*, 717 N.E.2d 32 (Ind. 1999).

[28] Two or more offenses are the "same offense" in violation of the Indiana double jeopardy clause, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense. *Id.* Barnhill does not present a claim under the statutory elements component of the analysis, directing his arguments exclusively to the "actual evidence" component.

---

[5] Barnhill does not present a claim under the federal Double Jeopardy Clause.

[29] To show that two challenged offenses constitute the same offense under the actual evidence test, "a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." *Id.* at 53. "The test is not merely whether the evidentiary facts used to establish one of the essential elements of one offense may also have been used to establish one of the essential elements of a second challenged offense." *Spivey v. State*, 761 N.E.2d 831, 833 (Ind. 2002).

[30] The "reasonable possibility" standard permits convictions for multiple offenses committed in a protracted criminal episode when the case is prosecuted in a manner that ensures that multiple guilty verdicts are not based on the same evidentiary facts. *Richardson*, 717 N.E.2d at 53 n.46. As a result, application of the actual evidence test requires the reviewing court to identify the essential elements of each of the challenged crimes and to evaluate the evidence from the jury's perspective, considering where relevant the jury instructions, argument of counsel, and other factors that may have guided the jury's determination. *Spivey*, 761 N.E.2d 831.

[31] In Barnhill's case, the trial court instructed the jury about the elements of the three offenses at issue as follows:

> Count Two (2). On or about March Fourteenth (14th), Two Thousand Eighteen (2018), through and including March Fifteenth (15th), Two Thousand Eighteen (2018), in Vigo

County, State of Indiana, Brenton Barnhill did, then and there, knowingly or intentionally confine H.P. without the consent of H.P., said act resulting in bodily injury to H.P., to-wit: abrasion, confusion (sic.), head injury, sprain and/or strain, in violation of Indiana law.

Count Three (3). On or about March Fourteenth (14th), Two Thousand Eighteen (2018), in Vigo County, State of Indiana, Brenton Barnhill, being at least eighteen (18) years of age, did, then and there, knowingly or intentionally touch H.P., a family or household member in a rude, insolent, or angry manner, and Brenton Barnhill committed said offense in the presence of a child less than sixteen (16) years of age, knowing the child was present and might be able to see or hear the offense.

Count Four (4). On or about March Fourteenth (14th), Two Thousand Eighteen (2018), in Vigo County, State of Indiana, Brenton Barnhill in a rude, insolent or angry manner, did, then and there, knowingly or intentionally apply pressure to the throat or neck of H.P. in a manner that impeded normal breathing or blood circulation of H.P. in violation of Indiana law.

Tr. Vol. III, pp. 20-21.

[32] During opening statements, the prosecutor discussed each charge with the jury. He said, "So the Criminal Confinement comes from the fact that he held her down. And as part of that, I've already told you that he battered her, so there's the Level Six (6) Domestic Battery as a felony." *Id.* at 37. As for strangulation, the prosecutor stated:

Um, so how do we prove that? Well we're gonna prove that by H.P., and I think we're gonna be able - you're, you're gonna see some photographs to see what she looked like; you're gonna

hear, possibly hear some medical testimony about a certain condition that she was diagnosed with that might be consistent with that, and he tells her, at one point, when she says I can't breathe, she's gonna tell you that he said, then stop breathing, or something along the lines of bitch, do you think if I care if you breathe?

*Id.* at 38-39. The prosecutor further indicated that photographs that were taken of H.P. the day after the attack would convince the jury "that a battery occurred." *Id.* at 42.

[33] Next, the prosecutor presented its evidence to the jury. H.P. specifically testified that Barnhill held her down with his legs, then choked her with one hand while striking her with the other. During final argument, the prosecutor argued Barnhill committed criminal confinement resulting in bodily injury when he "held her down against her will, wouldn't let her leave." Tr. Vol. IV, p. 56. In discussing whether Barnhill committed domestic battery in the presence of a child under sixteen years of age, the prosecutor explained that he had to prove Barnhill touched H.P. in a rude, insolent, or angry manner. The prosecutor further stated, "that's probably the least of which we could describe what – how he did it; touched H.P." *Id.* at 58. Regarding the charge of strangulation, the prosecutor directed the jury's attention to the marks around H.P.'s eyes, as noted at the hospital by the NP, as proof of that offense.

[34] Finally, the trial court included in its final jury instructions an explanation that "bodily injury" is defined as meaning any impairment of physical condition, including physical pain." Appellant's App. Vol. 2, p. 135.

[35] For the charges of criminal confinement resulting in bodily injury and domestic battery in the presence of a child under the age of sixteen, the trial court identified for the jury the distinct elements of those offenses. Next, H.P. testified that Barnhill pinned her down with his legs, trapping her arms, before striking her repeatedly "like [she] was a man." Tr. Vol. III, p. 77. In addition, the jury heard evidence that H.P. had bruises on her chest, which could have resulted from Barnhill restraining her. Finally, the prosecutor described for the jury which specific acts by Barnhill supported each conviction. We cannot conclude there is a reasonable possibility that the jury used the same evidence to support these two convictions. *See Jones v. State*, 976 N.E.2d 1271 (Ind. Ct. App. 2012) (convictions of criminal confinement and domestic battery did not violate same evidence test; witness's testimony provided separate evidence as to each charge), *trans. denied*.

[36] As for the charges of criminal confinement resulting in bodily injury and strangulation, H.P.'s testimony and the prosecutor's arguments also distinguished between the offenses, identifying different facts to support each charge. The prosecutor urged the jury to consider the NP's description of the bruises around H.P.'s eyes as being consistent with strangulation, which was different from her other injuries. We conclude these convictions also pass the "same evidence" test set forth in *Richardson*. *See Jones*, 976 N.E.2d 1271 (convictions of criminal confinement and strangulation did not violate same evidence test; witness' testimony provided separate evidence as to each charge).

[37] For the reasons stated above, we affirm the judgment of the trial court.

[38]    Judgment affirmed.

Vaidik, C.J., and Bailey, J., concur.